# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 1745 | **DATE** | 4/27/2004 |
| **CASE TITLE** | Lockhart vs. Jefferson Pilot Financial Ins Co | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 6/10/2004 at 11:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter memorandum opinion and order on motions for summary judgment. Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is denied.**

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | 2 | | **Document Number** |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | APR 2 8 2004 | | |
| | Notified counsel by telephone. | | | date docketed | | 28 |
| | Docketing to mail notices. | | | *UMJ* | | |
| | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | 4/27/2004 | | |
| SM | courtroom deputy's initials | | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | | SM mailing deputy initials | | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

APR 2 8 2004

|  |  |  |
|---|---|---|
| LEONORA LOCKHART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 03 C 1745 |
| v. | ) | |
| | ) | Magistrate Judge Ian H. Levin |
| JEFFERSON PILOT FINANCIAL | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security Act
(hereinafter "ERISA") of 1974, Plaintiff Leonora Lockhart (hereinafter "Plaintiff") seeks judicial
review of the final decision of Defendant Jefferson Pilot Financial Insurance Company (hereinafter
"Defendant") denying her long-term disability insurance benefits under a group policy issued to her
employer, the Illinois Hospital Association (hereinafter "IHA"). This matter comes before the Court
on cross-motions for summary judgment. For the reasons hereinafter set forth, the motions for
summary judgment of both parties are denied.

## BACKGROUND FACTS

### I.   Introduction

Plaintiff, an attorney, was employed in a non-legal position at the IHA as a Risk Management
Consultant from April 24, 1997 through January 31, 2002. (Def.'s LR 56.1(a)(3) St. ¶ 1.) Plaintiff's
principal function as a Risk Management Consultant was to provide risk management services to
insured physicians and hospitals and to assist them in developing and maintaining an effective
internal risk management program. (*Id.* ¶ 10.) Plaintiff's responsibilities included *inter alia*

28

performing underwriting site visits at applicant hospitals and publishing a quarterly newsletter for insured physicians. (JPF[1] 0275.)

## II.    Group Policy

As a benefit of Plaintiff's employment, she participated in the IHA's Long Term Disability Plan (hereinafter "Plan"), which is an employee welfare benefit plan established and maintained by the IHA in accordance with ERISA.[2] (Def.'s LR 56.1(a)(3) St. ¶ 3.) The Plan's long-term disability coverage is provided pursuant to a group policy issued to the IHA by Defendant. (*Id.* ¶ 4.) The group policy defines "Total Disability" and "Totally Disabled" as follows:

1.      During the Elimination Period [180 days] and Own Occupation Period [48 months], it means that due to an Injury or Sickness that the Insured Employee is unable to perform each of the main duties of his or her regular occupation.

2.      After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of any gainful occupation which his or her training, education or experience will reasonably allow. (JPF 0016, 0030, 0054, 0071.)

The group policy provides that an insured's claim must provide the following:

Proof of claim must be provided at the Insured Employee's own expense. It must show the date the Disability started, its cause and degree. It must show any restrictions on performing the duties of the Insured Employee's regular occupation. (JPF 0024, 0063.)

The IHA paid one hundred percent of the cost for Plaintiff's disability insurance coverage. (Def.'s LR 56.1(a)(3) St. ¶ 8.) An insured's coverage under the group policy ends when the insured is no longer employed by the IHA. (*Id.* ¶ 9.) The group policy provides insureds, upon termination

---

[1]Page references to JPF denote the administrative record in the case.

[2]The Plan constitutes an "employee welfare benefit plan" as defined by 29 U.S.C. § 1002(1) and Plaintiff received coverage under the Plan as a "participant" as defined by 29 U.S.C. § 1002(7).

of their employment, the opportunity to convert their group disability coverage into individual disability coverage. (*Id.*) However, insureds, who exercise their conversion rights, are responsible for paying the cost of their converted coverage. (*Id.*)

## III.  Plaintiff's Unsatisfactory Performance

On April 23, 2001, the IHA conducted an annual performance review of Plaintiff covering the period from May 2000 through April 2001. (Def.'s LR 56.1(a)(3) St. ¶ 14.) Ms. Cheryl Church, Plaintiff's supervisor, stated the following in Plaintiff's April 23, 2001 annual performance review:

> Last year [during the 1999-2000 annual performance review] five goals were established for you. Again, only one issue of the quarterly newsletter for physicians was completed. The newsletter is important, for one reason, it makes the risk management services visible.
>
> * * *
>
> I still have concerns about your productivity. Your final work products are generally very well done. However, you spend more time on some tasks than it seems you should. You should continue to keep focused on a particular assignment that you are working on, and learn to appreciate what additional factors and information have no relevance to the assignment. (JPF 0248.)

In addition, in a written memo dated October 19, 2001, Ms. Church stated the following regarding Plaintiff's job performance:

> I met with Penny [Lockhart] this morning to discuss my concerns with her productivity. [Some of the] [e]xamples discussed included the Dr. John Warner Bariatric Surgery survey report, which took almost two weeks to write. I told her that the report was well done but took way too long. We also discuss[ed] that she cannot seem to handle more than one project at a time. [An] example given was the HPIP survey done in May that has not been summarized yet.
>
> * * *
>
> I also told her she might want to think about other options for work that she might be better suited to. (JPF 0246.)

Subsequently, on January 31, 2002, the IHA terminated Plaintiff's employment due to poor

performance. (Def.'s LR 56.1(a)(3) St. ¶¶ 2, 20.) Ms. Church's January 31, 2002 termination memo

to Plaintiff stated:

> This is to summarize the discussion we had today whereby I advised you that your
> employment is being terminated, effective immediately.
>
> This action is being taken because of ongoing concerns about your limited ability to
> recognize and understand clinical risk management issues and your poor
> productivity. (JPF 0245.)

Following her termination, Plaintiff retained an attorney who worked with counsel for the

IHA in developing two letters for Plaintiff: a letter of recommendation and a letter regarding her

alleged disability.[3] (Def.'s LR 56.1(a)(3) St. ¶ 22.) In a letter dated April 9, 2002, the IHA attorney

agreed to the following language with respect to Plaintiff's letter of recommendation:

> [Plaintiff] was very enthusiastic about her work and was always willing to accept
> new assignments and challenges. <u>She exhibited sound judgment and completed her
> assignments in a very thorough and professional manner.</u>[4] She has excellent writing
> and communication skills. I would recommend her for any position requiring these
> skills. (JPF 0165.)

Moreover, in a letter dated the same date, the IHA attorney agreed to the following language in a

letter regarding her alleged disability:

> At the end of her employment, it appeared that [Plaintiff's] performance was
> adversely affected by her medical condition. (JPF 0165.)

After Plaintiff was terminated on January 31, 2002, she was no longer a covered insured

under the group policy. (Def.'s LR 56.1(a)(3) St. ¶ 25.) On February 28, 2002, Defendant extended

the time period (by thirty-one days) for former employees, including Plaintiff, to exercise their

---

[3]Defendant alleges that the subject letters were written in exchange for settling any
employment-related claims Plaintiff might have asserted against the IHA. (Def.'s LR 56.1(a)(3)
St. ¶ 22.)

[4]The IHA did not agree to the underlined language. (Def.'s LR 56.1(a)(3) St. ¶ 23.)

conversion privilege under the group policy. (*Id.* ¶ 26.) After Plaintiff's termination, she inquired about converting her group disability insurance coverage into individual disability insurance coverage, but decided not to convert (and continue) her coverage. (*Id.* ¶ 28.)

## IV. Disability Claim

On July 24, 2002, Plaintiff filed a claim for long-term disability benefits alleging she was disabled due to psoriatic arthritis[5] since January 24, 2002, the last day Plaintiff alleges she worked.[6] (Pl.'s LR 56.1(a)(3) St. ¶ 13; JPF 0281.) In her claim for benefits, Plaintiff alleged that she had had pain and stiffness in her hands during the past several years (i.e., 2000 and 2001) and, more recently, she had experienced pain in her feet and neck. (JPF 0283.) Plaintiff indicated that her pain and stiffness were worse in the mornings and she had to lie in bed for thirty minutes to an hour before she felt well enough to get out of bed. (*Id.*) Plaintiff further stated that her condition made it difficult for her to get dressed and attend to her personal hygiene which included bathing as well as brushing her teeth and hair. (*Id.*)

In her claim for disability benefits, Plaintiff indicated that because her joint pain was worse

---

[5]"Psoriatic arthritis is a form of joint inflammation that occurs in some people who have psoriasis of the skin or nails. Inflammation usually affects joints of the fingers and toes, although other joints, including the hips and spine, are often affected as well. The joints may become swollen and deformed when inflammation is chronic. Arthritis often involves joints less symmetrically than in rheumatoid arthritis and involves fewer joints. The joints at the end of the fingers adjacent to the diseased nails may be involved. The skin and joint symptoms sometimes appear and disappear together." Robert Berkow *et al.*, *The Merck Manual of Medical Information – Second Home Edition* 375 (2nd ed. 2003).

[6]Plaintiff's claim for benefits indicates that the date she was first unable to work was November 14, 2001. (JPF 0281.)

Defendant, in its response to Plaintiff's summary judgment motion, and in its additional statement of facts, alleges that Plaintiff's last work date was January 31, 2002, not January 24, 2002. (Def.'s Resp. at 3; Def.'s LR 56.1(b)(3)(B) St. ¶ 4.)

during cold or wet weather, she frequently went to warmer locales in the years 2000 and 2001. (JPF 0283.) Plaintiff also stated that "fatigue is a tremendous problem" and she did not sleep well due to joint pain and muscle aches. (*Id.*) She indicated that her medications cause side effects which include bronchitis, sinusitis, conjunctivitis, nosebleeds and psoriatic flare-ups.[7] (JPF 0283-84.) Moreover, Plaintiff stated that she has a history of depression and that her physical limitations prevented her from walking which was one way she managed her depression and stress. (JPF 284.) She further indicated that before she stopped working, she avoided out-of-town travel as much as possible, had difficulty in getting files out of cabinets, was very tired after sitting at a desk for extended periods of time, came in as late as possible due to early morning pain and stiffness, and could not stuff packets for mailings. (*Id.*)

## V.    Medical Evidence

### A.    Dr. Shelly L. Betman

Plaintiff supported her claim for long-term disability benefits with numerous medical records and reports from her treating physicians. For instance, Plaintiff submitted an April 26, 2002 Attending Physician Statement from her internist, Dr. Shelly L. Betman, M.D. (JPF 296-97.) In the Attending Physician Statement, Dr. Betman noted that Plaintiff has severe deformity, swelling and tenderness in her DIP joints (joints in the fingertips) as well as pain and swelling in her PIP joints (joints at the middle of the finger) in both of her hands. (JPF 0296.) Dr. Betman indicated that Plaintiff was unable to use her fingers for word processing, opening file cabinets and pulling out files, and traveling with and setting up equipment. (JPF 0297.) Dr. Betman further noted that

---

[7]Plaintiff indicated that these side effects were not disabling; however, they were troublesome and needed to be treated.  (JPF 0284.)

Plaintiff was restricted in lifting, carrying, using her hands and feet in repetitive actions and movements, crawling, and climbing. (*Id.*)

In the Attending Physician Statement, Dr. Betman further indicated that in an eight-hour workday, Plaintiff could sit for three to four hours; stand for two hours; and walk for no more than one-half an hour. (JPF 0297.) Dr. Betman further opined that she never expected Plaintiff to return to her prior level of functioning and that her prognosis for recovery was poor. (*Id.*) Dr. Betman, however, failed to specify the date that Plaintiff was first unable to work even though the Attending Physician Statement requested this information.[8] (JPF 0296.)

In addition to the Attending Physician Statement, the administrative record contains other medical records regarding Plaintiff's treatment with Dr. Betman. For instance, on December 24, 2001, Plaintiff sought treatment from Dr. Betman for fatigue and a sore throat. (JPF 0238.) Moreover, on December 28, 2001, Plaintiff underwent blood tests which were ordered by Dr. Betman. (JPF 0232-34.) Furthermore, on January 8, 2002, Plaintiff saw Dr. Betman for a follow-up visit, at which time, Dr. Betman indicated that Plaintiff should return in six weeks. (JPF 0236.)

**B.    Dr. Rosalind Ramsey-Goldman**

In support of her disability claim, Plaintiff submitted a May 31, 2002 letter from her treating rheumatologist, Dr. Rosalind Ramsey-Goldman.[9]  (JPF 0222.)  In the letter, Dr. Ramsey-Goldman stated:

We have been seeing her since July of 1998, and during this time there has been

---

[8]Dr. Betman failed to provide any information in the box labeled "Date you believe the patient was first unable to work (Month, Day, Year)." (JPF 0296.)

[9]Dr. Ramsey-Goldman wrote the May 31, 2002 letter to Dr. Betman (Plaintiff's internist) at Plaintiff's request. (Def.'s LR 56.1(a)(3) St. ¶ 51.)

7

significant progression of her disease with loss of function, particularly in the small joints of the hands and in the wrists. We have added several medications, and not all of these have been successful. She was on Arava,[10] and this did not result in a significant enough improvement, and in October of 2001, we recommended that she switch to Enbrel,[11] which she did do shortly thereafter. She has had some improvement, but not complete improvement, on the Enbrel, and now we are considering adding methotrexate.[12] Despite all of these treatments, we have documented joint damage in the small joints of both hands.

On her examination, this would be consistent with her complaints of limited function so that she cannot do her work, and also the amount of inflammation, fatigue and other constitutional symptoms would also limit her ability to work.

Therefore, I would support her claim of disability when she was unable to work in November, which was shortly after her visit with us in October, and that the official disability date starts in January. This is all consistent with our evaluation and her incomplete response to treatment and the documentation of loss of function and joint damage. (JPF 0222.)

Plaintiff provided additional medical records and documentation regarding her treatment with

Dr. Ramsey-Goldman for psoriatic arthritis to support her disability claim (and/or her administrative

appeal).[13] For example, Plaintiff submitted treatment records from Dr. Ramsey-Goldman for an

October 9, 2001 office visit.[14] (JPF 0109-0112.) Treatment notes from October 9, 2001 state:

---

[10]Arava is used in the treatment of rheumatoid arthritis. *The PDR Family Guide to Prescription Drugs* (hereinafter "*PDR Family Guide*") 52 (9th ed. 2002).

[11]Enbrel is used to treat the symptoms of moderate to severe rheumatoid arthritis when other drugs have proven to be inadequate. *PDR Family Guide,* at 252.

[12]Methotrexate is used to treat rheumatoid arthritis when other treatments have proven to be ineffective. *PDR Family Guide,* at 402. It is sometimes used to treat very severe and disabling psoriasis (a skin disease characterized by thickened patches of red, inflamed skin which is often covered with silver scales). *Id.*

[13]Some of Dr. Ramsey-Goldman's medical records and documentation were submitted to Defendant as part of Plaintiff's administrative appeal and were not part of the record at the time Plaintiff's initial claim was reviewed. (JPF 0092, 0097-0151.)

[14]On October 9, 2001, Plaintiff was examined by a physician whose name is illegible.
(continued...)

Since last visit has noted more swelling [and] pain. Not limiting her from working. No new patches of psoriasis. (JPF 0109.)

Moreover, the treatment notes indicate that Plaintiff no longer needed to take Vioxx[15]; however, she still needed to take Arava, Effexor,[16] Ritalin,[17] and Allegra.[18] (JPF 0109.) Furthermore, on the same date, it was also noted that Plaintiff has active psoriatic arthritis and moderate synovitis with deformity and she may need to take Enbrel or Remicade (used to treat active rheumatoid arthritis). (JPF 112.)

The treatment records, on October 9, 2001, further show that Plaintiff underwent an x-ray evaluation of her wrists and hands. (JPF 0147-0150.) With regard to Plaintiff's hands, Dr. Earl Nudelman, M.D., the attending radiologist, reported that "Joint space narrowing is present at the interphalangeal joints of the hand. There is soft tissue prominence, marked joint space narrowing, marginal sclerosis, and osteophyte formation present at the distal interphalangeal joints of both hands. No definite bone erosion or bone destruction is seen. No fracture is seen. Some minor periarticular deossification is noted at the interphalangeal joints of the hand, most marked at the proximal interphalangeal joints." (JPF 0148.) With regard to Plaintiff's left wrist, Dr. Nudelman

---

[14](...continued)
(JPF 0112.)

[15]Vioxx is a nonsteroidal anti-inflammatory pain killer used in the treatment of osteoarthritis and other types of acute pain. *PDR Family Guide*, at 738.

[16]Effexor is used for the treatment of a continuing depression that interferes with daily functioning. *PDR Family Guide*, at 241.

[17]Ritalin is typically used for the treatment of attention deficit hyperactivity disorder in children. *PDR Family Guide*, at 594.

[18]Allegra is an antihistamine used to treat the symptoms associated with hay fever. *PDR Family Guide*, at 29.

indicated that, "A slightly coarse trabecular pattern is identified compatible with some bony deossification. No joint space narrowing, significant osteophyte formation, or bone erosion is seen at the left wrist. No fracture is seen." (JPF 0149.) Moreover, with respect to Plaintiff's right wrist, Dr. Nudelman found that, "A slightly coarse trabecular pattern is identified compatible with some bony deossification. No bone erosion or significant osteophyte formation is present at the right wrist. No abnormal calcifications are present. No fracture is seen." (JPF 0150.)

In support of her disability claim, Plaintiff submitted treatment records from Dr. Ramsey-Goldman from an April 30, 2002 examination.[19] (JPF 0105-0108.) The treatment notes from April 30, 2002 reflect that Plaintiff continued to have joint pains and was unable to drive because of pain in her hands and neck. (JPF 0105.) Plaintiff, however, was able to perform activities of daily living, but was having difficulty with buttons and had two hours of morning stiffness. (*Id.*) Treatment notes further indicate that Plaintiff's psoriatic arthritis was "not well controlled on Arava or Enbrel alone." (JPF 0108.) Dr. Ramsey-Goldman noted that there was "only [a] partial response" to the Enbrel and there was "significant [joint] pain and functional limitation in [the] dominant [left] hand." (*Id.*) There was also evidence of synovitis in Plaintiff's DIP joints, decreased flexion in her left wrist, and decreased range of motion in her neck. (*Id.*) Dr. Ramsey-Goldman further noted that the disease was still active and she was considering adding methotrexate to Plaintiff's medications. (*Id.*)

Plaintiff submitted treatment records from a July 16, 2002 examination she underwent with Dr. Ramsey-Goldman. (JPF 0101-0104.) Treatment notes from this examination date indicate that Plaintiff has active psoriatic arthritis, she should continue with her current medications which include Enbrel and that wrist splints should be tried. (JPF 0104.) Moreover, Dr. Ramsey-Goldman

---

[19]On April 30, 2002, Plaintiff was examined by Dr. Yu. (JPF 0108.)

noted *inter alia* that Plaintiff's hands are showing chronic bony hypertrophy at her DIP joints; she

had swelling, pain and difficulty walking; and she also has pain in her neck and hands. (JPF 0101,

0103.) Dr. Ramsey-Goldman further indicated that Plaintiff had co-morbid conditions of depression

and sleep disorder. (JPF 0104.) She also noted that Plaintiff has fibromyalgia,[20] her depression is

"better," her fatigue is "mild," and she is in "no acute distress." (JPF 0101, 0102.) She further

indicated that Plaintiff is unemployed and "very happy with volunteer work."[21] (JPF 0101.)

### C.    Dr. Farid Karimi

To support her disability claim, Plaintiff submitted a June 27, 2002 letter to Dr. Betman from

her treating psychiatrist, Dr. Farid Karimi, M.D. (JPF 0220-21.) Dr. Karimi reported that Plaintiff

had been under his care and treatment since December 5, 2001[22] for a depressive disorder. (JPF

0220-21.) In his letter, Dr. Karimi stated *inter alia* the following:

> [Plaintiff] began experiencing significant depressive symptoms during the end of
> 2001. She reports that during that time, she had recently lost her father and was going
> through treatment for Rheumatoid Arthritis, Psoriasis and hearing loss. Also, the
> medications used to treat her medical conditions caused significant unwanted side
> effects. (JPF 0220.)

Dr. Karimi's Summary stated as follows:

> [Plaintiff's] psychiatric status is currently fragile and quickly decompensates further
> under minimal stress. [Her] current depressive symptoms include decreased energy,

---

[20]Treatment notes from June 5, 2001 indicate that Plaintiff has fibromyalgia. (JPF 0116.)

[21]The administrative record contains additional treatment notes and medical records from
Dr. Ramsey-Goldman which do not appear to have been specifically relied on by Plaintiff in her
claim for disability benefits or administrative appeal and do not appear to be part of the basis for
Defendant's denial determinations.

[22]The December 5, 2001 date specified in Dr. Karimi's letter appears to be incorrect.
(JPF 0220.) Rather, it appears that Dr. Karimi began treating Plaintiff on November 5, 2001, the
date he completed his initial psychiatric/psychological evaluation of her. (JPF 0216-17.)

hopelessness, helplessness, decreased concentration and constant fatigue. Due to the severity of her condition and symptoms, Plaintiff cannot maintain concentration, deal with work stresses or interact with co-workers or others in an emotionally stable manner. Even extremely low levels of stress manifest anxiety and depressive symptoms. Currently, it would not be possible for [Plaintiff] to perform any kind of work duties. Despite regular psychotherapy and psychotropic medications, [Plaintiff's] condition has not significantly improved. (JPF 0221.)

Moreover, Dr. Karimi, in the June 27, 2002 letter, reported *inter alia* with regard to Plaintiff's mental status examination that her mood is dysphoric, worried and anxious, her "[r]easoning is intact" and her "insight and judgment are concrete." (JPF 0221.) Dr. Karimi further indicated that Plaintiff has been prescribed the following medications for her depression: Paxil, Effexor and Ritalin. (*Id.*) Dr. Karimi, in his letter, however fails to opine as to Plaintiff's restrictions and whether she is precluded from working in her occupation as a Risk Management Consultant or any occupation from November 14, 2001 through her termination on January 31, 2002. (Def.'s LR 56.1(a)(3) St. ¶¶ 44-45.)

In addition to the June 27, 2002 letter, Dr. Karimi submitted an initial psychiatric/psychological evaluation (that appears to be dated November 5, 2001), progress notes from treatment sessions and a medication record regarding Plaintiff's condition. (JPF 0208, 0212-0217.) In his initial evaluation of Plaintiff, Dr. Karimi noted that Plaintiff's attention and concentration are "good/pass" and that her memory, reasoning and judgment are "good." (JPF 0217.) Dr. Karimi also indicates in his evaluation that Plaintiff has a global assessment of functioning ("GAF") score of 60.[23] (*Id.*)

---

[23]GAF measures an individual's overall level of psychological, social and occupational functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 32 (rev. 4th ed. 2000). A GAF score of 51 to 60 is intended to identify an individual with "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional

(continued...)

12

With regard to Dr. Karimi's treatment of Plaintiff, in his progress notes dated January 2, 2002, he indicated that Plaintiff is "feeling [fifty percent] better."[24] (JPF 0215.) Moreover, in January 30, 2002 progress notes, he stated that Plaintiff is "hopeful for [the] future" and "feeling better." (*Id.*) Furthermore, on April 17, 2002, the next time Plaintiff was treated by Dr. Karimi, treatment notes reflect that she was "doing well." (JPF 0214.)

Prior to being treated by Dr. Karimi, Plaintiff received psychiatric care primarily from Dr. Robert Lawton, M.D. of Suburban Psychiatric Associates, S.C. from June 19, 1997 through October 5, 2001.[25] (JPF 0173-85.) Dr. Lawton provided Defendant with numerous session notes and treatment records covering this time period. (*Id.*) As indicated by these sessions notes and treatment records, Plaintiff was being treated for a major depressive disorder. (*Id.*) Moreover, the progress notes indicate that, in 2001, Plaintiff saw Dr. Lawton six times (i.e., on January 11, 2001; March 7, 2001; May 7, 2001; June 20, 2001; August 30, 2001; and October 5, 2001). (JPF 0175-76.) At the last session on October 5, 2001, Dr. Lawton noted that Plaintiff is "[d]oing reasonably well but she is beginning to dread winter" and she is "awakening" from a "transient dysphoria." (JPF 0175.) Dr.

_____

[23](...continued)
panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

[24]The medical records (including the initial psychiatric/psychological evaluation, progress notes and medication record) submitted by Dr. Karimi are essentially illegible. (JPF 0208, 0212-0217.)

[25]Defendant cites Dr. Riaz Baber, M.D., as Plaintiff's treating psychiatrist from June 19, 1997 through October 5, 2001; however, respectfully, Defendant is incorrect. Plaintiff was treated by Dr. Richard Lawton and she also received treatment from Drs. Waters and Kniffin (Suburban Psychiatric Associates) during this time period. (JPF 0178-83.)

On November 6, 2001, treatment notes indicate that a prescription for Ritalin was mailed to Plaintiff. (JPF 0174.)

13

Lawton further noted that Plaintiff would be seeing a new therapist because he was leaving the practice. (*Id.*)

## VI. Claim Denial

On September 18, 2002, Defendant informed Plaintiff by letter that it was denying her claim for long-term disability benefits based on the provisions of the policy. (JPF 0169-71.) Defendant, in its letter, states the following:

> In order to determine disability, we must evaluate your capacity to perform work-related activity comparing the physical requirements of your occupation to the restrictions and limitations, which result from the condition causing the disability. However, the restrictions and limitations must be supported by medical evidence, which means office and treatment records, testing results, therapy notes, consultation reports, operative reports, etc. (JPF 0170.)

In the letter, Defendant next indicated that the decision to deny Plaintiff's claim was based upon medical documentation submitted by Drs. Betman, Karimi, Baber,[26] and Ramsey-Goldman as well as a laboratory report from Quest Diagnostics.[27] (JPF 0170.) Specifically, the denial letter indicated that the records show:

- Plaintiff was not seen by her physicians in November 2001 when she claimed her disability began.
- Dr. Karimi saw Plaintiff on December 5, 2001 for a condition that she was not claiming a disability.
- Dr. Betman saw Plaintiff on December 24, 2001 for fatigue and sore throat; however, there were no restrictions or limitations noted (nor was she restricted from working).
- Quest Diagnostic laboratory results from December 28, 2001 show negative or normal results except for high cholesterol levels which are not disabling.

---

[26]Dr. Baber is part of the Suburban Psychiatric Associates, S.C. practice, but never treated Plaintiff. Drs. Lawton, Kniffin and Waters of Suburban Psychiatric Associates, S.C. treated Plaintiff. (JPF 0173-85.)

[27]The record reflects that Plaintiff had blood tests done on December 28, 2001 which indicated she has high cholesterol. (JPF 0232-34.)

- In January of 2002, Dr. Karimi noted that Plaintiff had been feeling better. Dr. Betman saw Plaintiff for a follow-up visit in that same month and indicated that she should return in six months.[28] Dr. Ramsey-Goldman did not see Plaintiff in January of 2002.
- Dr. Barber's[29] most recent treatment record was dated October 5, 2001 at which time he stated that Plaintiff was "doing reasonably well but she is beginning to dread winter." (JPF 0170.)

In the denial letter, Defendant further stated that the medical documentation submitted by Drs. Betman, Karimi, Goldman-Ramsey and Barber did not provide any evidence of any significant restrictions or limitations that would preclude Plaintiff from performing the main duties of her occupation.[30] (JPF 0170.) Moreover, Defendant indicated that the IHA's records showed that Plaintiff was terminated on January 31, 2002 due to performance deficiencies which had been documented in her personnel records as far back as her April 23, 2001 performance evaluation. (*Id.*) Accordingly, Defendant determined that Plaintiff was not eligible for long-term disability benefits.[31] (*Id.*)

## VII. Administrative Appeal

---

[28]Dr. Betman's treatment record indicates that Plaintiff should return in six weeks, not six months. (JPF 0236.)

[29]Dr. Lawton treated Plaintiff on October 5, 2001. (JPF 0175.)

[30]The September 18, 2002 denial letter also stated that "there are no records from [Plaintiff's] physicians for any visits during the month of November [of 2001] and [her] visits in December [of] 2001 and January [of] 2002 do not record any significant restrictions or limitations that would support [her] inability to perform the main duties of [her] occupation as defined by this policy." (JPF 0170.)

[31]Defendant also noted that the IHA's time records show that Plaintiff had been absent from work on November 14, 2001 and November 15, 2001 due to sickness, but she was able to return to full-time work except for missing three and one-half hours on November 27, 2001. (JPF 0170.) The time records further reflect that, in January of 2002, Plaintiff was on vacation and no sick days were recorded prior to the date she was terminated. (*Id.*)

On October 17, 2002, Plaintiff (who was represented by counsel) provided Defendant, by letter, with notice of her appeal of Defendant's September 18, 2002 decision denying her long-term disability benefits. (JPF 0162-64.) In the notice of appeal, Plaintiff's attorney states that while the denial letter indicates that there is no documentation that Plaintiff's condition interfered with her ability to work, it is well-recognized (based on an IHA letter) "that [Plaintiff's] performance was adversely affected by her medical condition." (JPF 0163.) Moreover, Plaintiff's attorney states that "even if Plaintiff's employment was involuntarily terminated, her disability caused that termination and benefits are due." (*Id.*) Plaintiff's attorney further indicated his intent to comment on Plaintiff's medical issues because she remained under intensive medical treatment and requested that Defendant provide him with any and all pertinent documents contained in Plaintiff's claim file. (*Id.*)

On January 24, 2003, Plaintiff, through her attorney, submitted her appeal. (JPF 0090-95.) In her appeal, Plaintiff's attorney noted *inter alia* Dr. Betman's April 26, 2002 Attending Physician Statement in which her "disability was certified by [Dr.] Betman;" Dr. Ramsey-Goldman's May 31, 2002 letter documenting Plaintiff's treatment for psoriatic arthritis and the fact she "would support [Plaintiff's] claim of disability;" and Dr. Karimi's June 27, 2002 letter supporting various restrictions and limitations imposed by Plaintiff's severe depressive symptoms. (JPF 0091.) The appeal letter further noted that there were no medical records or reports in the claim file which contradicted the evidence submitted by Plaintiff's treating physicians; therefore, it was assumed that the decision on the claim was rendered without any input from a physician. (*Id.*) Moreover, Plaintiff's attorney indicated in the letter that it appeared that the IHA's "hostility to the claim dictated the denial of

benefits."[32] (*Id.*)

As part of Plaintiff's appeal, additional medical records and documentation from Dr. Ramsey-Goldman were submitted. (JPF 0092, 0097-0151.) In the January 24, 2003 appeal letter, Plaintiff's attorney notes that Dr. Ramsey-Goldman's records show an active psoriatic arthritis process and x-ray films taken in October of 2001 show deossification of the bones in Plaintiff's hands and wrists with joint space narrowing, sclerosis and osteophyte formation. (JPF 0092.) Plaintiff's attorney points out that part of Dr. Ramsey-Goldman's records are missing because "[w]e know for certain of a visit on January 29, 2002; and we are continuing to locate that record." (*Id.*) The letter further notes that there was treatment in the intervening period because the record from October of 2001 indicates that Arava might be discontinued and replaced with Enbrel, and it is apparent that additional treatment took place since Plaintiff was taking Enbrel by April of 2002. (*Id.*)

Plaintiff's counsel notes that treatment records from April of 2002 indicate that Plaintiff's psoriatic arthritis was not well controlled on "Arava and/or Enbrel alone." (JPF 0092.) Moreover, Dr. Ramsey-Goldman noted at that time that there was "only [a] partial response" to the Enbrel and there was "significant [joint] pain and functional limitation in [the] dominant [left] hand." (*Id.*) Dr. Ramsey-Goldman further indicated that there was evidence of synovitis, decreased flexion in Plaintiff's left wrist, and decreased range of motion in Plaintiff's neck. (*Id.*) Dr. Ramsey-Goldman also documented that she was considering adding methotrexate to Plaintiff's medications.[33] (*Id.*)

---

[32]There was a July 23, 2002 letter sent via facsimile in Plaintiff's claim file from Lois De Traglia who stated that Plaintiff was "not eligible to collect [long-term disability benefits] under IHA's plan with [Defendant]." (JPF 0285-86.)

[33]Plaintiff's counsel also points out that Dr. Ramsey-Goldman's July 2002 records indicate that Plaintiff's psoriatic arthritis was still active and she further noted "co-morbid
(continued...)

In the January 24, 2003 appeal letter, Plaintiff's attorney further points out that Plaintiff's condition also affected her vision and included medical records from Dr. Mary Szatkowski-Pritikin indicating active rheumatoid arthritis, blurry vision, an inability to wear contact lenses and burning eyes. (JPF 0092, 0156-60.)

As part of the appeal, Plaintiff's attorney submitted a November 25, 2002 letter from one of Plaintiff's co-workers which delineated the medical problems (i.e., arthritis that caused severe joint pain, vision problems, depression and lack of stamina) Plaintiff had while they worked together over a five to six year period. (JPF 0092, 0152.) For example, the letter expressed that "Arthritis was the worst of the problems, causing [Plaintiff] severe joint pain, primarily in her hands and legs" and "Depression was also one of the most debilitating illnesses [Plaintiff] also dealt with while trying to work." (JPF 0152.) Moreover, Plaintiff's attorney, included as part of the appeal, information that Enbrel, one of Plaintiff's medications, "is associated with significant side effects" including serious blood reactions and systemic disorders such as Lupus.[34] (JPF 0093, 0153-55.)

On February 5, 2003, Defendant consulted a registered nurse, L.J. Sayles, R.N., regarding Plaintiff's administrative appeal. (JPF 0001-02.) Defendant ultimately denied Plaintiff's appeal in a letter dated February 14, 2003. (JPF 0086-88.) In its denial letter, Defendant states:

After reviewing the file again in its entirety, we have determined that the medical

---

[33](...continued)
conditions [of] depression and sleep disorder (fibromyalgia)." (JPF 0092.)

[34]One document submitted by Plaintiff's counsel states that four women in Chicago with rheumatoid arthritis developed symptoms of the autoimmune disease systemic lupus erythematosus (SLE) after taking the drug etanercept (Enbrel); however, such side-effects are very rare. (JPF 0153.) A second document states that Enbrel which is used by more than 70,000 rheumatoid arthritis patients in the United States may be responsible for serious blood reactions and stimulate nervous system disorders. (JPF 0155.)

evidence continues to demonstrate a lack of severity of impairment in [Plaintiff's] condition which would have rendered her unable to perform the main duties of her occupation beyond the Elimination Period.

According to our records, [Plaintiff] worked until January 24, 2002, and was terminated effective January 31, 2002. The medical records note diagnoses including psoriatic arthritis, depression and decreased vision. The records show that [Plaintiff] has seen a rheumatologist since at least 1998 for her psoriatic arthritis. The psoriasis was localized to the scalp, trunk and extremities. The arthritis mostly affected her hands and feet, and later her neck and knees. Her last visit prior to her last day worked, was October 9, 2001. At that time she had moderate synovitis with deformity of fingers. X-rays were taken of the hands showing bone loss and she was taking an anti-arthritic medication. She indicated that she had not needed to take Vioxx, and it was noted that her pain had not limited her from working.

The next available office note from her rheumatologist is not until April 2002. There may have been additional visits between October 2001, and April 2002; however, these were not provided. The notes from April 2002 indicate she is able to perform activities of daily living but is having difficulty with buttons and has two hours of morning stiffness. The documentation indicates functional limitations but does not specify what those limitations are. The exam notes left hand synovitis in the finger joints, decreased flexion in the left wrist, and her physician was considering adding methotrexate to her therapy.

Her next visit was July 16, 2002, [at which time she had] . . . decreased range of motion in her neck. Her hands were showing chronic bony hypertrophy of the DIP joints. This is the last office visit we have from her rheumatologist. This office visit is still within her elimination period, and there is no evidence of her condition beyond July 24, 2002, when her elimination period ended.

In regard to her depression, the records show that she had been treated for depression since at least 1997. She was seen two times in January 2002; however, the psychiatric notes are essentially illegible. The June 27, 2002, letter from Dr. Karimi indicates her depression and anxiety are so bad that she is fragile and decompensates under minimal stress and that it would not be possible for her to perform any kind of work duties; however, in the July 16, 2002, note from her rheumatologist, it notes that her depression is better and that she has much less anxiety and that she was enjoying her volunteer work.

Her vision problems consist of blurred vision and dry eyes and were treated in January 2002. She had plugs placed in the lacrimal canal to keep a greater amount of eye lubrication in the eye. This was effective and appears to have solved her vision problems.

[Plaintiff] may have some limitation based on the rheumatology notes; however, these notes do not detail her limitations as far as how these limitations affect how she cannot perform the main duties of her occupation, as it appears she is able to do volunteer work, in spite of her pain and depression.

In summary, the medical records that we have been provided with fail to demonstrate a severity of impairment in her condition that would have warranted Total Disability beyond her elimination period, and therefore, we are unable to consider benefits at this time. (JPF 0086-87.)

## VIII.  Additional Evidence

### A.  Dr. Ramsey-Goldman's Deposition

On December 5, 2003, Plaintiff deposed Dr. Ramsey-Goldman for the limited purpose of determining if she had a recollection of treating Plaintiff in January of 2002 and/or if there was any record of such treatment. At the deposition, Dr. Ramsey-Goldman testified that she had no specific recollection of seeing Plaintiff between October 9, 2001 and April 30, 2002. (Ramsey-Goldman Dep. at 17-18.) Moreover, Dr. Ramsey-Goldman testified that she did not have a record of an office visit in her chart of any date between October 9, 2001 and April 30, 2002 with regard to Plaintiff. (*Id.* at 18.) Dr. Ramsey-Goldman further indicated that her office had problems with record-keeping and that it's a "continu[ing] challenge for our office all the time." (*Id.* at 16.)

Plaintiff, however, as part of her opening memorandum produced a copy of an insurance record indicating she had an office visit with Dr. Goldman-Ramsey on January 29, 2002. (Pl.'s Ex. C, Tab 2.)

### B.  Social Security Claim

On October 10, 2003, the Social Security Administration notified Plaintiff that she was entitled to receive disability benefits and, in accordance with the agency's rules, she became disabled on January 31, 2002. (Pl.'s Ex. D.)

# LEGAL STANDARDS

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has produced evidence to show that it is entitled to summary judgment, the party seeking to avoid such judgment must affirmatively demonstrate that a genuine issue of material fact remains for trial. *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 920 (7th Cir. 1997).

In deciding a motion for summary judgment, a court must "review the record in the light most favorable to the nonmoving party and . . . draw all reasonable inferences in that party's favor." *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 964 (7th Cir. 1998). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nevertheless, the nonmovant may not rest upon mere allegations, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See also Linc*, 129 F.3d at 920. A genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505, 91 L.Ed.2d 202, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505, 91 L.Ed.2d 202. Therefore, if the court concludes that

"the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and summary judgment must be granted. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348, 89 L.Ed.2d 569 (*quoting First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

## II.    ERISA STANDARD OF REVIEW

A court will review a plan administrator's denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). *See also Militello v. Central States, Southeast and Southwest Areas Pension Fund,* 360 F.3d 681, 685 (7th Cir. 2004); *Hackett v. Xerox Corp. Long-Term Disability Income Plan,* 315 F.3d 771, 773 (7th Cir. 2003). Where the plan grants discretionary authority to the administrator, the court reviews a denial of benefits under the arbitrary and capricious standard. *Militello,* 360 F.3d at 685; *Hackett,* 315 F.3d at 773. Accordingly, under ERISA, "[t]he standard of review depends on the amount of discretion that plan documents afford the plan administrator." *Militello,* 360 F.3d at 685.

The parties have agreed that the *de novo* standard of review is applicable herein. (Transcript of Proceedings, Nov. 5, 2003, at 4; Pl.'s Mem. at 5-6; *see* Def.'s Resp. at 14-15.) Upon review, the Court agrees and finds that the *de novo* standard of review is applicable here, as the Summary Plan Description and Plan do not vest the Plan Administrator (the IHA)[35] with discretionary authority to determine benefits eligibility or to construe the terms of the Plan.

------------------------------

[35]The Plan Administrator is the Illinois Hospital Association.  (JPF 0043.)

## DISCUSSION

Plaintiff essentially avers that summary judgment should be granted in her favor because, as demonstrated by the record evidence, her treating physicians opined that she is unequivocally disabled. (*See* Pl.'s Mem.; Pl.'s Resp.) Specifically, Plaintiff contends that her treating rheumatologist, Dr. Ramsey-Goldman and her treating internist, Dr. Betman have "certified [her] disability." (Pl.'s Resp. at 4.) Moreover, Plaintiff asserts that her treating physicians, including her treating psychiatrist, Dr. Karimi, have produced medical records and documentation which indicate that she has experienced functional limitations and difficulties since as early as 1998 and that a decline in her physical condition began disabling her as of November 14, 2001, and has continued to the present. (*Id.* at 4-5.) Plaintiff further argues that medical records document that she was disabled on January 24, 2002, which is when she avers she ceased working due to her disability. (*Id.* at 5.)

In support of her motion, Plaintiff also contends that Defendant has failed to produce any medical evidence contradicting the opinions of her treating physicians. (Pl.'s Mem. at 6, 8.) Specifically, Plaintiff states Defendant never availed itself of its contractual right to have her examined by a physician and, moreover, a physician never reviewed her medical file. (Pl.'s Mem. at 8; Pl.'s Resp. at 5.) Accordingly, Plaintiff avers that there is no genuine issue of material fact with respect to her disability which has rendered her unable to work. (*See* Pl.'s Mem.; Pl.'s Resp.)

Defendant, on the other hand, in support of its own summary judgment motion, essentially asserts that six months after Plaintiff was terminated for poor performance, and six months after she ceased to be an insured under the IHA's group policy, she first submitted a claim for long-term disability benefits, in which she alleged to be totally disabled. (Def.'s Mem. at 1; Def.'s Resp. at 1.)

23

Defendant contends that Plaintiff attempted to circumvent her coverage problem by backdating the onset of her purported total disability by eight months to November 14, 2001 (and even now she tries to change her date of alleged disability to January 24, 2002). (Def.'s Resp. at 1, 2-3.) Defendant further avers that Plaintiff failed to substantiate her disability claim with contemporaneous medical records and, moreover, did not provide medical evidence of occupational restrictions that existed at the time of her alleged disability or during the time she was a covered insured. (Def.'s Resp. at 1-2, 4-6.) Accordingly, Defendant asserts that it properly and correctly denied Plaintiff's disability claim and summary judgment should be granted in its favor.

The parties motions implicitly frame the issue(s) as being that the Plaintiff either was or was not totally disabled under the policy provisions as a matter of law. The Court finds, however, that genuine issues of material fact exist as to whether the Plaintiff was or was not totally disabled under the provisions of the policy at the time(s) in question.

The Court does not find it necessary to recite here all the genuine, material factual issues that exist in the record. As to Defendant's motion, suffice it to say here, for example, that Plaintiff's treating rheumatologist, Dr. Ramsey-Goldman's opinion was that she would support Plaintiff's claim for disability from both November, 2001 and January, 2002; and, particularly coupled with this treating rheumatologist opinion, certain testimony of Dr. Betman, Dr. Karimi's report that Plaintiff began suffering significant depressive symptoms during the end of 2001 and Plaintiff's co-worker's observations as to Plaintiff's arthritis and depression generate reasonable inferences in Plaintiff's favor on Defendant's summary judgment motion.

As to Plaintiff's motion, it suffices to say, for example, that Plaintiff was terminated from her employment, rather than her resigning due to disability (Plaintiff worked up until at least a week

before her termination); and, particularly coupled with this termination versus disability resignation fact(s), a number of the facts recited in Defendant's denial letters generate reasonable inferences in the Defendant's favor on Plaintiff's summary judgment motion (as does Dr. Ramsey-Goldman's treatment notes of October 9, 2001, stating that Plaintiff's condition and symptoms were "not limiting her from working").[36]

## **CONCLUSION**[37]

In view of the foregoing, the Court denies Plaintiff's and Defendant's motions for summary judgment in the cause.

A status hearing will be set by separate minute order to discuss timing and procedures for further proceedings in the case. *See Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan,* 195 F.3d 975, 981 (7th Cir. 1999); *Casey v. Uddeholm,* 32 F.3d 1094,1098-99 (7th Cir. 1994); *Coles v. LaSalle Partners Inc. Disability Plan,* 287 F.Supp.2d 896, 905 (N.D. Ill. 2003).[38]

---

[36]The Court also find that the weight to be given the Social Security Administration's disability determination herein is more appropriately conducted during the subsequent fact finding phase in this case, rather than at the summary judgment stage. *See Coles v. LaSalle Partners Inc. Disability Plan,* 287 F.Supp.2d 896, 902 (N.D. Ill. 2003).

[37]In view of the Court's ruling herein, it is deemed unnecessary to consider Plaintiff's and Defendant's other arguments raised herein.

[38]In its *de novo* review, the Court deems this to be a situation that permits the introduction of additional evidence, at trial, necessary to enable the Court to make an informed and independent judgment in the case. *See Coles,* 287 F.Supp.2d at 904-05; *Casey,* 32 F.3d at 1099.

ENTER:

IAN H. LEVIN
United States Magistrate Judge

Dated:  April 27, 2004