IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LEONORA LOCKHART,                    )
                                     )
        Plaintiff,                   )
                                     )    Case No. 03 C 1745
v.                                   )
                                     )    Magistrate Judge Ian H. Levin
JEFFERSON PILOT FINANCIAL            )
INSURANCE COMPANY,                   )
                                     )
        Defendant.                   )
                                     )

## MEMORANDUM OPINION AND ORDER

Pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security Act
(hereinafter "ERISA") of 1974, 29 U.S.C. § 1132(a)(1)(B), Plaintiff Leonora Lockhart (hereinafter
"Plaintiff") seeks judicial review of Defendant Jefferson Pilot Financial Insurance Company's
(hereinafter "Defendant") decision to deny her long-term disability insurance benefits under a group
policy issued to her employer, the Illinois Hospital Association (hereinafter "IHA"). For the reasons
hereinafter set forth, the Court remands the cause for further proceedings consistent with this
opinion.

## BACKGROUND FACTS

### I.     INTRODUCTION

Plaintiff, an attorney, was employed in a non-legal position at the IHA as a Risk Management
Consultant from April 24, 1997 through January 31, 2002. (JPF[1] 0270, 0285.) In her capacity as a
Risk Management Consultant, Plaintiff's was responsible for providing risk management services

---

[1]Page references to JPF denote the administrative record in the case.

to insured physicians and member/client hospitals in order to assist them in developing and

maintaining effective internal risk management programs. (JPF 0275.) Plaintiff was terminated

from her position at the IHA on January 31, 2002. (JPF 0245.)

## II.   GROUP POLICY

Plaintiff participated in the IHA's Long Term Disability Plan (hereinafter "Plan"), which is

an employee welfare benefit plan established and maintained by the IHA in accordance with ERISA.[2]

(JPF 0015-0045, 0051-0083.) The Plan's long-term disability coverage is provided pursuant to a

group policy issued to the IHA by Defendant. (JPF 0015-45, 0051-83.) The group policy defines

"Total Disability" and "Totally Disabled" as follows:

1.      During the Elimination Period [180 days] and Own Occupation Period [48
        months], it means that due to an Injury or Sickness that the Insured Employee
        is unable to perform each of the main duties[3] of his or her regular occupation.

2.      After the Own Occupation Period, it means that due to an Injury or Sickness
        the Insured Employee is unable to perform each of the main duties of any
        gainful occupation which his or her training, education or experience will
        reasonably allow. (JPF 0016, 0022, 0030, 0054, 0060, 0071.)

The group policy defines "Partially Disabled" or "Partial Disability" as follows:

1.      During the Elimination Period [180 days] and Own Occupation Period [48
        months], it means that due to an Injury or Sickness the Insured Employee:

---

[2]The Plan constitutes an "employee welfare benefit plan" as defined by 29 U.S.C. §
1002(1). Plaintiff was covered under the Plan as a "participant" as defined by 29 U.S.C. §
1002(7).

[3]An Insured Employee's main duties or material and substantial duties are those job
duties which:
        1.  are normally required to perform the Insured Person's regular occupation;
            and
        2.  cannot reasonably be modified or omitted.
It includes those main duties as performed in the national workforce; not as performed for
a certain firm or at a certain work site. (JPF 0021, 0059.)

(a)    is unable to perform one or more of the main duties of his or her regular occupation, or is unable to perform such duties full-time; and

(b)    is engaged in Partial Disability Employment.[4]

2.    After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee:

(a)    is unable to perform one or more of the main duties of any gainful occupation which his or her training, education or experience will reasonably allow; or is unable to perform such duties full-time; and

(b)    is engaged in Partial Disability Employment. (JPF 0016, 0021, 0031, 0054, 0059, 0072.)

The group policy states that an insured must provide the following:

> Proof of [the] claim must be provided at the Insured Employee's own expense. It must show the date the Disability started, its cause and degree. It must show any restrictions on performing the duties of the Insured Employee's regular occupation. (JPF 0024, 0063.)

The IHA paid one hundred percent of the cost of Plaintiff's disability insurance coverage. (JPF 0043.) An insured's coverage under the group policy ends when the insured is no longer employed by the IHA. (JPF 0015, 0016, 0028, 0054, 0067.) The group policy provides an insured, upon termination of his or her employment, with the opportunity to obtain converted long term disability insurance (i.e., individual policy). (JPF 0029, 0069.)

## III.  PLAINTIFF'S UNSATISFACTORY PERFORMANCE

On April 23, 2001, the IHA conducted an annual performance review of Plaintiff covering the period from May 2000 through April 2001. (JPF 0248.) Ms. Cheryl Church, Plaintiff's

---

[4]Partial Disability Employment means the Insured Employee is working at his or her own or any other occupation; but because of a Partial Disability:

1.    the Insured Employee's hours or production is reduced;

2.    one or more main duties of the job are reassigned; or

3.    the Insured Employee is working in a lower-paid occupation.

His or her current earnings must be at least 20% of Predisability Income, and may not exceed the percentage specified in the Partial Disability Benefit section. (JPF 0021, 0059.)

supervisor, stated the following in Plaintiff's April 23, 2001 annual performance review:

> Last year [during the 1999-2000 annual performance review] five goals were established for you. Again, only one issue of the quarterly newsletter for physicians was completed. The newsletter is important, for one reason, it makes the risk management services visible.
>
> * * *
>
> I still have concerns about your productivity. Your final work products are generally very well done. However, you spend more time on some tasks than it seems you should. You should continue to keep focused on a particular assignment that you are working on, and learn to appreciate what additional factors and information have no relevance to the assignment. (JPF 0248.)

In addition, in a written memo dated October 19, 2001, Ms. Church stated the following regarding

Plaintiff's job performance:

> I met with Penny [Lockhart] this morning to discuss my concerns with her productivity. [Some of the] [e]xamples discussed included the Dr. John Warner Bariatric Surgery survey report, which took almost two weeks to write. I told her that the report was well done but took way too long. We also discuss[ed] that she cannot seem to handle more than one project at a time. [An] example given was the HPIP survey done in May that has not been summarized yet.
>
> * * *
>
> I also told her she might want to think about other options for work that she might be better suited to. (JPF 0246.)

Subsequently, on January 31, 2002, the IHA terminated Plaintiff's employment due to poor

performance. (JPF 0245, 0285.) Ms. Church's January 31, 2002 termination memo to Plaintiff

stated:

> This is to summarize the discussion we had today whereby I advised you that your employment is being terminated, effective immediately.
>
> This action is being taken because of ongoing concerns about your limited ability to recognize and understand clinical risk management issues and your poor productivity. (JPF 0245.)

4

Following Plaintiff's termination, she retained an attorney who worked with counsel for the IHA in developing two letters: a letter of recommendation and a letter regarding her alleged disability.[5] (JPF 0165-66.) In a letter dated April 9, 2002, the IHA attorney agreed to the following letter of recommendation:

> [Plaintiff] worked for the Illinois Hospital and Health Systems Association as a Risk Management Consultant from April 24, 1997 through January 31, 2002. [Plaintiff] was an excellent [and] valuable resource for our insured physicians and their office staff. Our insureds relied upon [Plaintiff] for her expertise and appreciated her strong in-service programs.

> [Plaintiff] was very enthusiastic about her work and was always willing to accept new assignments and challenges. She has excellent writing and communication skills.[6]

> I would recommend her for any position requiring these skills. (JPF 0165.)

Moreover, in a letter dated the same day, the IHA attorney agreed to the following language in a letter regarding Plaintiff's alleged disability:

> [Plaintiff] worked for the Illinois Hospital and Health Systems Association as a Risk Management Consultant from April 24, 1997 through January 31, 2002. At the end of her employment, it appeared that [Plaintiff's] performance was adversely affected by her medical condition. (JPF 0165-66.)

Following Plaintiff's termination on January 31, 2002, she was no longer a covered insured under the group policy. (JPF 0015, 0016, 0028, 0054, 0067, 0270, 0285.) On February 28, 2002,

---

[5]Defendant alleges that Plaintiff retained an attorney to negotiate two "agreed" letters with the IHA in April of 2002, in exchange for settling any employment-related claims she might have asserted against the IHA. (Def.'s Trial Brief at 3.) For example, Defendant avers that in one negotiated letter, Plaintiff bargained to have the IHA praise her job performance which she could then use when she applied for future employment positions. (*Id.*) Defendant further asserts that at the same time, Plaintiff negotiated a second letter to bolster a future disability claim. (*Id.*)

[6]The IHA, however, would not agree to include the following statement originally contained in the second paragraph of the termination letter: She exhibited sound judgment and completed her assignments in a very thorough and professional manner. (JPF 0165-66.)

Defendant extended the time period by thirty-one days for former employees to exercise their conversion privilege under the group policy. (JPF 0289.) Plaintiff inquired about converting her group disability insurance coverage into individual coverage, but she decided not to convert (and continue) her coverage. (JPF 0290-91.)

## IV. DISABILITY CLAIM

On July 24, 2002, Plaintiff submitted a claim for long-term disability benefits alleging she was disabled due to psoriatic arthritis[7] since January 24, 2002, the last day Plaintiff alleges she was able to work due to her disability.[8] (JPF 0281-84.) In her claim for benefits, Plaintiff alleged that she had had pain and stiffness in her hands during 2000 and 2001 and, more recently, she had experienced pain in her feet and neck. (JPF 0283.) Plaintiff indicated that her pain and stiffness were worse in the mornings and she had to lie in bed for thirty minutes to an hour before she felt well enough to get out of bed. (*Id.*) Plaintiff further stated that her condition made it difficult for her to get dressed and attend to her personal hygiene which included bathing as well as brushing her teeth and hair. (*Id.*)

In her claim for disability benefits, Plaintiff indicated that because her joint pain was worse during cold or wet weather, she frequently went to warmer locales during 2000 and 2001. (JPF

---

[7]"Psoriatic arthritis is a form of joint inflammation that occurs in some people who have psoriasis of the skin or nails. Inflammation usually affects joints of the fingers and toes, although other joints, including the hips and spine, are often affected as well. The joints may become swollen and deformed when inflammation is chronic. Arthritis often involves joints less symmetrically than in rheumatoid arthritis and involves fewer joints. The joints at the end of the fingers adjacent to the diseased nails may be involved. The skin and joint symptoms sometimes appear and disappear together." Robert Berkow *et al.*, *The Merck Manual of Medical Information – Second Home Edition* 375 (2d ed. 2003).

[8]Plaintiff's claim for benefits indicates that the date she was first unable to work was November 14, 2001. (JPF 0281.)

0283.) Plaintiff also stated that "fatigue is a tremendous problem" and she did not sleep well due to joint pain and muscle aches. (*Id.*) She indicated that her medications cause side-effects which include bronchitis, sinusitis, conjunctivitis, nosebleeds, and psoriatic flare-ups.[9] (JPF 0283-84.) Moreover, Plaintiff stated that she had a history of depression and that her physical limitations prevented her from walking which was one way she managed her depression and stress. (JPF 284.) She further indicated that before she stopped working, she avoided out-of-town travel as much as possible, had difficulty in getting files out of cabinets, was very tired after sitting at a desk for extended periods of time, came in as late as possible due to early morning pain and stiffness, and could not stuff packets for mailings. (*Id.*)

## V.    MEDICAL EVIDENCE

Plaintiff supported her claim for long-term disability benefits with numerous medical records and reports from her treating physicians.

### A.    Dr. Shelly L. Betman

Plaintiff submitted an April 26, 2002 Attending Physician's Statement from her internist, Dr. Shelly L. Betman, M.D. (JPF 0296-97.) In the Attending Physician's Statement, Dr. Betman noted that Plaintiff has severe deformity, swelling and tenderness in her DIP joints (joints in the fingertips) as well as pain and swelling in her PIP joints (joints in the middle of the finger) in both of her hands. (JPF 0296.) Dr. Betman indicated that Plaintiff was unable to use her fingers for word processing, opening file cabinets and pulling out files, and traveling with and setting up equipment and should not do anything that causes severe pain and swelling in her joints. (JPF 0297.) Dr. Betman further

---

[9]Plaintiff indicated that these side-effects were not disabling; however, they were troublesome and needed to be treated. (JPF 0284.)

noted that Plaintiff was restricted in lifting, carrying, using her hands and feet in repetitive actions and movements, crawling, and climbing. (*Id.*)

In the Attending Physician's Statement, Dr. Betman indicated that in an eight-hour workday, Plaintiff could sit for three to four hours; stand for two hours; and walk for no more than one-half an hour. (JPF 0297.) Dr. Betman further opined that she never expected Plaintiff to return to her prior level of functioning and that her prognosis for recovery was poor. (*Id.*) Dr. Betman, however, failed to specify the date that Plaintiff was first unable to work even though the Attending Physician's Statement requested this information.[10] (JPF 0296.)

In addition to the Attending Physician's Statement, the administrative record contains other medical records regarding Plaintiff's treatment with Dr. Betman. For instance, on December 24, 2001, Plaintiff sought treatment from Dr. Betman for fatigue and a sore throat. (JPF 0238.) Moreover, on December 28, 2001, Plaintiff underwent blood tests which were ordered by Dr. Betman. (JPF 0232-34.) Furthermore, on January 8, 2002, Plaintiff saw Dr. Betman for a follow-up visit, at which time, she indicated that Plaintiff should return in six weeks. (JPF 0236.)

**B.      Dr. Rosalind Ramsey-Goldman**

In support of her disability claim, Plaintiff submitted a May 31, 2002 letter from her treating rheumatologist, Dr. Rosalind Ramsey-Goldman.[11] (JPF 0222.) In the letter, Dr. Ramsey-Goldman stated:

We have been seeing [Plaintiff] since July of 1998, and during this time there has

---

[10]Dr. Betman failed to provide any information in the box labeled "Date you believe the patient was first unable to work (Month, Day, Year)." (JPF 0296.)

[11]Dr. Ramsey-Goldman wrote the subject May 31, 2002 letter to Dr. Betman at Plaintiff's request. (JPF 0222.)

been significant progression of her disease [psoriatic arthritis] with loss of function, particularly in the small joints of the hands and in the wrists. We have added several medications, and not all of these have been successful. She was on Arava,[12] and this did not result in a significant enough improvement, and in October of 2001, we recommended that she switch to Enbrel,[13] which she did do shortly thereafter. She has had some improvement, but not complete improvement, on the Enbrel, and now we are considering adding methotrexate.[14] Despite all of these treatments, we have documented joint damage in the small joints of both hands.

On her examination, this would be consistent with her complaints of limited function so that she cannot do her work, and also the amount of inflammation, fatigue and other constitutional symptoms would also limit her ability to work.

Therefore, I would support her claim of disability when she was unable to work in November, which was shortly after her visit with us in October, and that the official disability date starts in January. This is all consistent with our evaluation and her incomplete response to treatment and the documentation of loss of function and joint damage. (JPF 0222.)

Plaintiff provided additional medical records regarding her treatment with Dr. Ramsey-Goldman for psoriatic arthritis to support her disability claim (and/or her administrative appeal).[15]

For example, Plaintiff submitted treatment records from Dr. Ramsey-Goldman for an October 9, 2001 office visit. (JPF 0109-0112.) Treatment notes from October 9, 2001 state:

Since last visit ha[ve] noted more swelling [and] pain. Not limiting her from

---

[12]Arava is used in the treatment of rheumatoid arthritis. *The PDR Family Guide to Prescription Drugs* (hereinafter "*PDR Family Guide*") 52 (9th ed. 2002).

[13]Enbrel is used to treat the symptoms of moderate to severe rheumatoid arthritis when other drugs have proven to be inadequate. *PDR Family Guide,* at 252.

[14]Methotrexate is used to treat rheumatoid arthritis when other treatments have proven to be ineffective. *PDR Family Guide,* at 402. It is sometimes used to treat very severe and disabling psoriasis (a skin disease characterized by thickened patches of red, inflamed skin which is often covered by silver scales). *Id.*

[15]Some of Dr. Ramsey-Goldman's medical records were submitted to Defendant as part of Plaintiff's administrative appeal and were not part of the record at the time Plaintiff's initial claim was reviewed. (JPF 0092, 0097-0151.)

working. No new patches of psoriasis. (JPF 0109.)

Moreover, the treatment notes indicate that Plaintiff no longer needed to take Vioxx[16]; however, she still needed to take Arava, Effexor,[17] Ritalin,[18] and Allegra.[19] (JPF 0109.) Furthermore, on the same day, it was noted that Plaintiff has active psoriatic arthritis and moderate synovitis with deformity and she may need to take Enbrel or Remicade which are medications used to treat active rheumatoid arthritis. (JPF 0112.)

Additional medical records dated October 9, 2001 indicate Plaintiff underwent x-ray evaluations of her wrists and hands which were ordered by Dr. Ramsey-Goldman. (JPF 0147-50.) Regarding Plaintiff's x-ray evaluation of her hands, Dr. Earl Nudelman, M.D., the attending radiologist, reported that:

> Joint space narrowing is present at the interphalangeal joints of the hand. There is soft tissue prominence, marked joint space narrowing, marginal sclerosis, and osteophyte formation present at the distal interphalangeal joints of both hands. No definite bone erosion or bone destruction is seen. No fracture is seen. Some minor periarticular deossification is noted at the interphalangeal joints of the hand, most marked at the proximal interphalangeal joints. (JPF 0148.)

With respect to Plaintiff's left wrist, Dr. Nudelman indicated that "[a] slightly coarse trabecular pattern is identified compatible with some bony deossification. No joint space narrowing, significant

---

[16]Vioxx is a nonsteroidal anti-inflammatory pain killer used in the treatment of osteoarthritis and other types of acute pain. *PDR Family Guide*, at 738.

[17]Effexor is used for the treatment of continuing depression that interferes with daily functioning. *PDR Family Guide*, at 241.

[18]Ritalin is typically used for the treatment of attention deficit hyperactivity disorder in children; however, it is also used to treat other diseases and conditions. *PDR Family Guide*, at 594.

[19]Allegra is an antihistamine used to treat the symptoms associated with hay fever. *PDR Family Guide*, at 29.

osteophyte formation, or bone erosion is seen at the left wrist. No fracture is seen." (JPF 0149.) Moreover, with regard to Plaintiff's right wrist, Dr. Nudelman found that, "[a] slightly coarse trabecular pattern is identified compatible with some bony deossification. No bone erosion or significant osteophyte formation is present at the right wrist. No abnormal calcifications are present. No fracture is seen." (JPF 0150.)

Plaintiff submitted treatment records from Dr. Ramsey-Goldman for an April 30, 2002 office visit. (JPF 0105-08.) The treatment notes from this date reflect that Plaintiff continued to have joint pain and was unable to drive because of pain in her hands and neck. (JPF 0105.) Plaintiff, however, was able to perform activities of daily living, but was having difficulty with buttons and had two hours of morning stiffness. (*Id.*) Treatment notes further indicated that Plaintiff's psoriatic arthritis was "not well controlled on Arava or Enbrel alone." (JPF 0108.) Dr. Ramsey-Goldman noted that there was "only [a] partial response" to the Enbrel and there was "significant [joint] pain and functional limitation in [the] dominant [left] hand." (*Id.*) There was also evidence of synovitis in Plaintiff's DIP joints, decreased flexion in her left wrist, and decreased range of motion in her neck. (*Id.*) Dr. Ramsey-Goldman noted that the disease was still active and was contemplating adding methotrexate to Plaintiff's medications. (*Id.*)

In support of her disability claim, Plaintiff submitted treatment records from Dr. Ramsey-Goldman for a July 16, 2002 examination. (JPF 0101-04.) Treatment notes from this date indicate Plaintiff has active psoriatic arthritis, should continue with her current medications including Enbrel and should try using wrist splints. (JPF 0104.) Dr. Ramsey-Goldman noted *inter alia* that Plaintiff's hands are showing chronic bony hypertrophy at her DIP joints; she has swelling, pain and difficulty walking; and she has pain in her neck and hands. (JPF 0101, 0103.) She further indicated Plaintiff

11

had co-morbid conditions of depression and a sleep disorder (JPF 0104) and noted Plaintiff has fibromyalgia,[20] her depression is "better," her fatigue is "mild," and she is in "no acute distress." (JPF 0101, 0102.) Dr. Ramsey-Goldman also indicated that Plaintiff was unemployed and "very happy with volunteer work."[21]  (JPF 0101.)

### C.    Dr. Farid Karimi

To support her disability claim, Plaintiff submitted a June 27, 2002 letter from her treating psychiatrist, Dr. Farid Karimi, M.D., which indicated she had been under his care and treatment for a depressive disorder since December 5, 2001.[22] (JPF 0220-21.)  Dr. Karimi provided a Summary in his letter which stated as follows:

> [Plaintiff's] psychiatric status is currently fragile and quickly decompensates further under minimal stress. [Her] current depressive symptoms include decreased energy, hopelessness, helplessness, decreased concentration and constant fatigue. Due to the severity of her condition and symptoms, Plaintiff cannot maintain concentration, deal with work stresses or interact with co-workers or others in an emotionally stable manner. Even extremely low levels of stress manifest anxiety and depressive symptoms. Currently, it would not be possible for [Plaintiff] to perform any kind of work duties. Despite regular psychotherapy and psychotropic medications, [Plaintiff's] condition has not significantly improved. (JPF 0221.)

Dr. Karimi further noted that he diagnosed Plaintiff as suffering from a major depression (recurrent and severe) and indicated Plaintiff was taking Paxil, Effexor and Ritalin for her depression. (JPF

---

[20]Treatment notes from June 5, 2001 indicate that Plaintiff has fibromyalgia.  (JPF 0116.)

[21]The administrative record contains additional medical records and treatment notes from Dr. Ramsey-Goldman which do not appear to have been specifically relied on by Plaintiff in her claim for disability benefits or administrative appeal and do not appear to be part of the basis for Defendant's denial determinations.

[22]The December 5, 2001 date specified in Dr. Karimi's letter may be incorrect because the administrative record reflects that Dr. Karimi likely began treating Plaintiff on November 5, 2001, the date he completed his initial psychiatric/psychological evaluation of Plaintiff. (JPF 0216-17, JPF 0220.)

0221.) He noted that Plaintiff's medications had "produced minimal response" and she "continues to be depressed with significant anxiety related symptoms." (*Id.*)

The administrative record also contains Dr. Karimi's initial psychiatric/psychological evaluation pertaining to Plaintiff, progress notes from treatment sessions and a medication record.[23] (JPF 0208, 0212-17.) In his initial evaluation of Plaintiff, Dr. Karimi noted that Plaintiff's attention and concentration were "good/pass"and her memory, reasoning and judgment were "good." (JPF 0217.) Dr. Karimi also indicated in his initial evaluation that Plaintiff had a global assessment of functioning ("GAF") score of 60.[24] (*Id.*)

With regard to Dr. Karimi's treatment of Plaintiff, in his progress notes dated January 2, 2002, he indicated that Plaintiff is "feeling [fifty percent] better." (JPF 0215.) Moreover, in January 30, 2002 progress notes, he stated that Plaintiff is "hopeful for [the] future" and "feeling better." (*Id.*) Furthermore, on April 17, 2002, the next time Plaintiff was seen by Dr. Karimi, treatment notes reflect that she was "doing well." (JPF 0214.)

Prior to being treated by Dr. Karimi, Plaintiff received psychiatric care primarily from Dr. Robert Lawton, M.D. during the period of June 19, 1997 through October 5, 2001.[25] (JPF 0173-85.)

---

[23]The initial psychiatric/psychological evaluation, progress notes and medication record submitted by Dr. Karimi are essentially illegible. (JPF 0208, 0212-0217.)

[24]GAF measures an individual's overall level of psychological, social and occupational functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 32 (rev. 4th ed. 2000). A GAF score of 51 to 60 is intended to identify an individual with "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

[25]Plaintiff was treated by Dr. Robert Lawton and she also received treatment from Drs. Waters and Kniffin during this time period. (JPF 0173-85.)

13

As indicated by Dr. Lawton's numerous sessions notes, Plaintiff was treated for a major depressive

disorder during this time period and was prescribed medications including Effexor and Ritalin for

her disorder. (*Id.*) Moreover, the sessions notes indicate that Dr. Lawton saw Plaintiff six times in

2001: January 11, 2001; March 7, 2001; May 7, 2001; June 20, 2001; August 30, 2001; and October

5, 2001. (JPF 0175-76.) At the last session on October 5, 2001, Dr. Lawton noted that Plaintiff is

"[d]oing reasonably well but she is beginning to dread winter" and she is "awakening" from a

"transient dysphoria." (JPF 0175.) Dr. Lawton further noted that Plaintiff would be seeing a new

therapist because he was leaving the practice. (*Id.*)

## VI.    DENIAL OF CLAIM

On September 18, 2002, Defendant informed Plaintiff by letter that it was denying her claim

for long-term disability benefits based on the provisions of the group policy. (JPF 0169-71.)

Defendant, in its letter, stated the following:

> In order to determine disability, we must evaluate your capacity to perform work-
> related activity comparing the physical requirements of your occupation to the
> restrictions and limitations, which result from the condition causing the disability.
> However, the restrictions and limitations must be supported by medical evidence,
> which means office and treatment records, testing results, therapy notes, consultation
> reports, operative reports, etc. (JPF 0170.)

In the letter, Defendant indicated that the decision to deny Plaintiff's claim was based upon medical

documentation submitted by Drs. Betman, Karimi, Baber,[26] and Ramsey-Goldman as well as a

laboratory report from Quest Diagnostics.[27] (JPF 0170.) Specifically, the denial letter stated that the

---

[26]Plaintiff never received any type of treatment from Dr. Baber. (JPF 0173-85.) Dr. Baber
was part of the same medical practice as Drs. Lawton, Waters and Kniffin. (JPF 0173.)

[27]The record reflects that Plaintiff had blood tests done on December 28, 2001 which
indicated she had high cholesterol. (JPF 0232-34.)

medical records show:

- Plaintiff was not seen by her physicians in November 2001 when she claimed her disability began.
- Dr. Karimi saw Plaintiff on December 5, 2001 for a condition for which she was not claiming a disability.
- Dr. Betman saw Plaintiff on December 24, 2001 for fatigue and sore throat; however, there were no restrictions or limitations noted (nor was she restricted from working).
- Quest Diagnostic laboratory results from December 28, 2001 show negative or normal results except for high cholesterol levels which are not disabling.
- In January of 2002, Dr. Karimi noted that Plaintiff had been feeling better. Dr. Betman saw Plaintiff for a follow-up office visit in that same month and indicated that she should return in six months.[28] Dr. Ramsey-Goldman did not see Plaintiff in January of 2002.
- Dr. Barber's[29] most recent treatment record was dated October 5, 2001 at which time he stated that Plaintiff was "doing reasonably well but she is beginning to dread winter." (JPF 0170.)

In the denial letter, Defendant further stated that the medical documentation submitted by Drs. Betman, Karimi, Goldman-Ramsey and Barber did not provide any evidence of a significant restriction or limitation that would preclude Plaintiff from performing the main duties of her occupation. (JPF 0170.) The denial letter specifically indicated that "there are no records from [Plaintiff's] physicians for any visits during the month of November [of 2001] and [her] visits in December [of] 2001 and January [of] 2002 do not record any significant restrictions or limitations that would support [her] inability to perform the main duties of [her] occupation as defined by this policy." (*Id.*) In addition, Defendant noted that the IHA's records showed that Plaintiff was terminated on January 31, 2002 due to performance deficiencies which had been documented in her personnel records as far back as her April 23, 2001 performance evaluation. (*Id.*) Accordingly,

---

[28]Dr. Betman's treatment record indicated that Plaintiff should return in six weeks, not six months. (JPF 0236.)

[29]Dr. Lawton treated Plaintiff on October 5, 2001. (JPF 0175.)

Defendant determined that Plaintiff was not eligible for long-term disability benefits under the group policy.[30] (*Id.*)

## VII. ADMINISTRATIVE APPEAL

On October 17, 2002, Plaintiff (who was represented by an attorney) provided Defendant, by letter, with her notice of appeal of the decision rendered by Defendant on September 18, 2002 denying her disability claim. (JPF 0162-63.) In the notice of appeal, Plaintiff's attorney stated that while the denial letter indicates that there is no documentation that Plaintiff's condition interfered with her ability to work, it was well-recognized (based on an IHA letter) "that [Plaintiff's] performance was adversely affected by her medical condition." (JPF 0163.) Moreover, Plaintiff's attorney stated that "even if Plaintiff's employment was involuntarily terminated, her disability caused that termination and benefits are due." (*Id.*) Plaintiff's attorney further indicated his intent to comment on Plaintiff's medical issues because she remained under intensive medical treatment. (*Id.*) Moreover, Plaintiff's attorney requested that Defendant provide him with any and all pertinent documents contained in Plaintiff's claim file so that he could prepare the appeal. (JPF 0162-63.)

On January 24, 2003, Plaintiff, through her attorney and by letter, submitted her administrative appeal asserting that Defendant's decision to deny her long-term disability benefits was erroneous because Plaintiff's condition was so severe that it rendered her unable to work. (JPF 0090-95.) In the letter of appeal, Plaintiff's attorney initially noted *inter alia* Dr. Betman's April 26, 2002 Attending Physician Statement in which her "disability was certified by [Dr.] Betman;" Dr.

---

[30]Defendant also noted that the IHA's time records showed that Plaintiff had been absent from work on November 14, 2001 and November 15, 2001 due to sickness, but she was able to return to her full-time schedule except for missing three and one-half hours on November 27, 2001. (JPF 0170.) The time records further reflected that, in January of 2002, Plaintiff was on vacation and no sick days were recorded prior to the date she was terminated. (*Id.*)

Ramsey-Goldman's May 31, 2002 letter documenting Plaintiff's treatment for psoriatic arthritis and the fact she "would support [Plaintiff's] claim of disability;" and Dr. Karimi's June 27, 2002 letter supporting various restrictions and limitations imposed by Plaintiff's severe depressive symptoms. (JPF 0091.) The appeal letter further noted that there were no medical records or reports in the claim file which contradicted the evidence submitted by Plaintiff's treating physicians; therefore, it was assumed that the decision on the claim was rendered without any input from a physician. (*Id.*) Moreover, Plaintiff's attorney indicated in the letter that it appeared that the IHA's "hostility to the claim dictated the denial of benefits."[31] (*Id.*)

As part of the January 24, 2003 appeal letter, Plaintiff's attorney submitted additional medical records from Dr. Ramsey-Goldman. (JPF 0092, 0097-0151.) Based on these additional records, Plaintiff's attorney pointed out that Dr. Ramsey-Goldman's medical chart indicated an active psoriatic arthritis process and, moreover, x-ray films taken in October of 2001 showed deossification of the bones in Plaintiff's hands and wrists with joint space narrowing, sclerosis and osteophyte formation. (JPF 0092.) Plaintiff's attorney also noted that a portion of Dr. Ramsey-Goldman's medical records were missing because "the records jump from October 2001 to April 2002, with a notation that the old chart was not available."[32] (*Id.*) The appeal letter further indicated that Plaintiff received treatment in the intervening period because the record from October of 2001

---

[31]There was a July 23, 2002 letter in Plaintiff's claim file from Lois De Traglia, Vice President of the IHA who stated that IHA's long-term disability plan was available only to current IHA employees. (JPF 0285-86.) Ms. De Traglia further stated that Plaintiff was not on long-term disability when her employment was terminated and she "is not eligible to collect [long-term disability] under IHA's [long-term disability] plan with [Defendant]." (JPF 0285.)

[32]Plaintiff's attorney further indicated that "[w]e know for certain of a visit on January 29, 2002; and we are continuing to locate that record." (JPF 0092.)

indicated that Arava might be discontinued and replaced with Enbrel, and it was apparent that additional treatment took place because Plaintiff had taken Enbrel by April of 2002; however, her condition had not improved. (*Id.*)

Plaintiff's attorney, in the appeal letter, also pointed out that treatment records from April of 2002 indicated that Plaintiff's psoriatic arthritis was not well controlled on "Arava and/or Enbrel alone." (JPF 0092.) Medical records indicated that Dr. Ramsey-Goldman noted at that time that there was "only [a] partial response" to the Enbrel and there was "significant [joint] pain and functional limitation in [the] dominant [left] hand." (*Id.*) Dr. Ramsey-Goldman further indicated that there was evidence of synovitis, decreased flexion in Plaintiff's left wrist, and decreased range of motion in Plaintiff's neck. (*Id.*) Additional documentation indicated that Dr. Ramsey-Goldman was considering adding methotrexate to Plaintiff's medications. (*Id.*)

Plaintiff's attorney also pointed to Dr. Ramsey-Goldman's subsequent medical reports which indicated that there was no significant improvement in Plaintiff's condition. (JPF 0092). For example, in July of 2002, Dr. Ramsey-Goldman noted that Plaintiff's psoriatic arthritis was still active and indicated she had "co-morbid conditions [of] depression and [a] sleep disorder (fibromyalgia)." (*Id.*) Moreover, Dr. Ramsey-Goldman's treatment note from December of 2001 corroborated Plaintiff's fatigue, ongoing inflammatory process and depression. (*Id.*)

In the January 24, 2003 appeal letter, Plaintiff's attorney pointed out that Plaintiff's condition adversely affected her vision and included medical records from her ophthalmologist, Dr. Mary Szatkowski-Pritikin, M.D., which noted Plaintiff's active rheumatoid arthritis, blurry vision, inability to wear contact lenses and burning eyes. (JPF 0092, 0156-60.)

As part of the appeal, Plaintiff's attorney submitted a November 25, 2002 letter from one of

Plaintiff's co-workers which delineated the medical problems she experienced while they worked together over a five to six year period. (JPF 0092, 0152.) For example, in the letter, Plaintiff's co-worker expressed that "[a]rthritis was the worst of the problems, causing [Plaintiff] severe joint pain, primarily in her hands and legs" and "[d]epression was also one of the most debilitating illnesses [Plaintiff] also dealt with while trying to work." (JPF 0152.) Plaintiff's co-worker further indicated that Plaintiff had vision problems related to her arthritis which included dry eyes and conjunctivitis, lack of stamina, and hearing loss. (*Id.*)

In the January 24, 2003 letter of appeal, Plaintiff's attorney included news reports on Enbrel, one of Plaintiff's medications. (JPF 0093, 0153-55.) The news reports indicated that Enbrel is associated with significant side effects including serious blood reactions and systemic disorders such as Lupus.[33] (*Id.*)

Plaintiff's attorney further pointed to the fact that Defendant failed to adequately consider the opinions of Plaintiff's treating physicians, and in the absence of any contrary medical evidence, Defendant's decision lacked a reliable medical basis. (JPF 0093-94.) Accordingly, Plaintiff's attorney asserted that Plaintiff's disability was well-supported in the record and she should be found disabled because she was unable to perform numerous essential and material duties of her occupation which would qualify her for "total disability" as defined under the group policy. (JPF 0090, 0093-94.)

---

[33]One news report states that four women in Chicago with rheumatoid arthritis developed symptoms of the autoimmune disease systemic lupus erythematosus (SLE) after taking the drug etanercept (Enbrel); however, this type of side-effect is very rare and the symptoms disappeared when the women stopped using the drug. (JPF 0153.) Another news report states that Enbrel which is used by more than 70,000 rheumatoid arthritis patients in the United States may be responsible for serious blood reactions and stimulate nervous system disorders. (JPF 0155.)

## VIII. DENIAL OF ADMINISTRATIVE APPEAL

After reviewing and consulting with a registered nurse regarding Plaintiff's administrative appeal, Defendant denied Plaintiff's appeal in a letter dated February 14, 2003. (JPF 0001-02, 0086-88.) In the denial letter, Defendant stated:

> After reviewing the file again in its entirety, we have determined that the medical evidence continues to demonstrate a lack of severity of impairment in [Plaintiff's] condition which would have rendered her unable to perform the main duties of her occupation beyond the Elimination Period.
>
> According to our records, [Plaintiff] worked until January 24, 2002, and was terminated effective January 31, 2002. The medical records note diagnoses including psoriatic arthritis, depression and decreased vision. The records show that [Plaintiff] has seen a rheumatologist since at least 1998 for her psoriatic arthritis. The psoriasis was localized to the scalp, trunk and extremities. The arthritis mostly affected her hands and feet, and later her neck and knees. Her last visit prior to her last day worked, was October 9, 2001. At that time she had moderate synovitis with deformity of fingers. X-rays were taken of the hands showing bone loss and she was taking an anti-arthritic medication. She indicated that she had not needed to take Vioxx, and it was noted that her pain had not limited her from working.
>
> The next available office note from her rheumatologist is not until April 2002. There may have been additional visits between October 2001, and April 2002; however, these were not provided. The notes from April 2002 indicate she is able to perform activities of daily living but is having difficulty with buttons and has two hours of morning stiffness. The documentation indicates functional limitations but does not specify what those limitations are. The exam notes left hand synovitis in the finger joints, decreased flexion in the left wrist, and her physician was considering adding methotrexate to her therapy.
>
> Her next visit was July 16, 2002, . . . [at which time she had] decreased range of motion in her neck. Her hands were showing chronic bony hypertrophy of the DIP joints. This is the last office visit we have from her rheumatologist. This office visit is still within her elimination period, and there is no evidence of her condition beyond July 24, 2002, when her elimination period ended.
>
> In regard to her depression, the records show that she had been treated for depression since at least 1997. She was seen two times in January 2002; however, the psychiatric notes are essentially illegible. The June 27, 2002, letter from Dr. Karimi indicates her depression and anxiety are so bad that she is fragile and decompensates under

minimal stress and that it would not be possible for her to perform any kind of work duties; however, in the July 16, 2002, note from her rheumatologist, it notes that her depression is better and that she has much less anxiety and that she was enjoying her volunteer work.

Her vision problems consist of blurred vision and dry eyes and were treated in January 2002. She had plugs placed in the lacrimal canal to keep a greater amount of eye lubrication in the eye. This was effective and appears to have solved her vision problems.

[Plaintiff] may have some limitation based on the rheumatology notes; however, these notes do not detail her limitations as far as how these limitations affect how she cannot perform the main duties of her occupation, as it appears she is able to do volunteer work, in spite of her pain and depression.

In summary, the medical records that we have been provided with fail to demonstrate a severity of impairment in her condition that would have warranted Total Disability beyond her elimination period, and therefore, we are unable to consider benefits at this time. (JPF 0086-87.)

## IX.    SOCIAL SECURITY BENEFITS

On October 10, 2003, the Social Security Administration (hereinafter "SSA") notified Plaintiff that she was entitled to receive disability benefits and, in accordance with the agency's rules, she was disabled as of January 31, 2002. (Pl.'s Trial Brief at 3.)

## LEGAL STANDARDS

The case is before the Court for decision as a trial on the papers. The parties have submitted trial briefs in this matter and have stipulated to an administrative record which constitutes the record in this case.[34] *See* Joint Stipulation filed July 8, 2004. *See e.g., Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 665 (7th Cir. 2003)(*citing Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)("a trial on a stipulated paper record is equivalent to a conventional trial on (largely) oral

---

[34]The parties have stipulated that the Social Security Administration's disability determination is part of the administrative record in this case; therefore, it can be considered by the Court. *See* Joint stipulation filed July 8, 2004.

evidence"); *see also Koswenda v. Flossmoor Sch. Dist. No. 161*, 227 F.Supp.2d 979, 984 (N.D. Ill. 2002)(*citing Acuff-Rose Music, Inc. v. Jostens, Inc.*, 155 F.3d 140, 142 (2nd Cir. 1998)("A district court may conduct a summary bench trial 'based on the record compiled in summary judgment proceedings' if the parties so stipulate and indicate a waiver of a full bench trial."); *Brach's Confections, Inc. v McDougall*, 320 F.Supp.2d 726 (N.D. Ill. 2004)(ERISA case decided by means of a trial on the papers). The parties have agreed to proceed by means of a trial on the papers and to waive their right to oral testimony on the issues herein presented. *See* Joint Stipulation dated July 8, 2004.

In a prior ruling on the parties' cross-motions for summary judgment, the Court determined and the parties agreed that the *de novo* standard of review is applicable herein. *Lockhart v. Jefferson Pilot Fin. Ins. Co.,* 314 F.Supp.2d 797, 811 (N.D. Ill. 2004). That means the Court must determine if Defendant's decision was "merely incorrect" as opposed to whether it was unreasonable, which would be the standard if Defendant had discretionary authority. *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 329 (7th Cir. 2000).

## DISCUSSION

Plaintiff avers that she is entitled to long-term disability benefits under the group policy because, as of January 24, 2002, she was no longer able to perform her job duties due to severe symptoms of pain and fatigue caused by inflammatory arthritis, psoriasis, fibromyalgia, and depression. (Pl.'s Trial Brief at 1.) Plaintiff contends she was subsequently terminated from her position as a Risk Management Consultant on January 31, 2002 because her medical symptoms interfered with her job performance. (*Id.*) Plaintiff asserts she has provided Defendant with numerous medical records and reports from her treating physicians to support her long-term

disability claim which document the progression of her disease and the medications taken for her condition. (Pl.'s Trial Brief at 2-3.) Plaintiff contends that despite the overwhelming medical evidence of her disability, Defendant denied both her initial claim for benefits and administrative appeal. (*Id.*)

Defendant, on the other hand, asserts that Plaintiff has failed to satisfy her burden of proving that she was "totally disabled" from all of the main duties of her occupation prior to the time her employment with the IHA was terminated on January 31, 2002. (Defendant's Trial Brief at 2.) Defendant avers that the medical opinions of Plaintiff's treating physicians were generated subsequent to her employment with IHA and after her long-term disability insurance coverage ended on January 31, 2002. (*Id.* at 1.) Defendant contends that while Plaintiff avers that her medical condition deteriorated shortly before her termination from the IHA, the medical evidence shows that Plaintiff's rheumatologist, Dr. Ramsey-Goldman noted that Plaintiff was "not limited from working" in October of 2001 and her condition had improved after starting treatment with Enbrel in December of 2001. (*Id.* at 1-2.) Accordingly, Defendant asserts that it appropriately denied Plaintiff long-term disability insurance benefits under the group policy. (*Id.*)

As stated, Defendant provides IHA employees with long-term disability insurance coverage under a group policy. (JPF 0015-45, 0051-83.) The group policy defines "Total Disability" and "Totally Disabled" as follows:

1.  During the Elimination Period [180 days] and Own Occupation Period [48 months], it means that due to an Injury or Sickness that the Insured Employee is unable to perform each of the main duties[35] of his or her regular

---

[35]An Insured Employee's main duties or material and substantial duties are those job duties which:

(continued...)

occupation.

2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of any gainful occupation which his or her training, education or experience will reasonably allow. (JPF 0016, 0022, 0030, 0054, 0060, 0071.)

The group policy defines "Partially Disabled" or "Partial Disability" as follows:

1. During the Elimination Period [180 days] and Own Occupation Period [48 months], it means that due to an Injury or Sickness the Insured Employee:

   (a) is unable to perform one or more of the main duties of his or her regular occupation, or is unable to perform such duties full-time; and
   (b) is engaged in Partial Disability Employment.[36]

2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee:

   (a) is unable to perform one or more of the main duties of any gainful occupation which his or her training, education or experience will reasonably allow; or is unable to perform such duties full-time; and
   (b) is engaged in Partial Disability Employment. (JPF 0016, 0021, 0031, 0054, 0059, 0072.)

Given these definitions, if Plaintiff could perform even one of the main duties of her regular

occupation despite her condition, then she would not qualify for "total disability" benefits under the

_____

[35](...continued)
   1. are normally required to perform the Insured Person's regular occupation; and
   2. cannot reasonably be modified or omitted.
It includes those main duties as performed in the national workforce; not as performed for a certain firm or at a certain work site. (JPF 0021, 0059.)

[36]Partial Disability Employment means the Insured Employee is working at his or her own or any other occupation; but because of a Partial Disability:
   1. the Insured Employee's hours or production is reduced;
   2. one or more main duties of the job are reassigned; or
   3. the Insured Employee is working in a lower-paid occupation.
His or her current earnings must be at least 20% of Predisability Income, and may not exceed the percentage specified in the Partial Disability Benefit section. (JPF 0021, 0059.)

group policy. Defendant was first responsible for determining the precise nature of Plaintiff's main (or material and substantial) duties of her regular occupation and next whether Plaintiff's condition at the time of her termination rendered her unable to perform each of those duties.

At the time of Plaintiff's termination with the IHA on January 31, 2002, she was a Risk Management Consultant. (JPF 0275.) Plaintiff's position description as provided by the IHA summarizes her "main function" as providing risk management services to insured physicians and member/client hospitals in order to assist them in developing and maintaining effective internal risk management programs. (*Id.*) The position description also provides an "outline of responsibilities" which delineates that Plaintiff was responsible for performing consultative services for client inquiries regarding risk management and medical-legal concerns; identifying problems, patterns and trends in hospitals or physician practices and recommending corrective action to prevent patient harm and minimize financial loss; providing educational programs for clients in the form of in-service programs, seminars and risk management committee meetings; performing on-site services which include risk management surveys and audits of clinical areas and follow-up on risk management issues; conducting underwriting site visits at applicant member hospitals; and publishing a quarterly newsletter for insured physicians. (*Id.*)

Plaintiff's position description indicated she was required to use a computer for word processing and other types of computer programs, copy machine, calculator and dictating equipment. (JPF 0276.) She was also required to work additional morning and evening hours and travel approximately thirty-five percent of the time. (*Id.*) In addition, a long-term disability claim job analysis completed by Defendant indicated that Plaintiff was required to do many of the same activities as described in the position description; such as, typing on a computer, using a telephone

25

and traveling by automobile. (JPF 0272-73.) With regard to the other physical aspects of Plaintiff's position, the job analysis also indicated she needed to frequently[37] stand, walk and sit. (JPF 0272-73.) Furthermore, the job analysis indicated Plaintiff frequently needed to relate to others, engage in written and verbal communication, make independent judgments and exert math and language reasoning skills. (JPF 0272.)

While Defendant's position description and job analysis give the Court some idea of what was required of Plaintiff in her capacity as a Risk Management Consultant at the IHA, the picture is not complete. Specifically, neither the position description nor job analysis provide an adequate explanation as to which or all of Plaintiff's delineated responsibilities or activities constitute the main (or material and substantial) duties of her regular occupation. Rather, the position description and job analysis merely provide a general description of Plaintiff's responsibilities and activities. Moreover, there is no other information in the administrative record upon which the Court can rely to determine the exact nature of Plaintiff's main duties.[38] *See e.g., Cate v. CNA Ins. Cos.*, 965 F.Supp. 1039, 1045 (M.D. Tenn. 1997)(action remanded because the record contained "no evidence as to the substantial and material duties" of the plaintiff's occupation).

Next, the Court notes that the medical evidence contained in the administrative record merely delineates the various limitations and restrictions Plaintiff experiences as a result of her illness and offers conclusory opinions as to whether Plaintiff was disabled. Importantly, none of Plaintiff's

---

[37]Frequently means that an individual performs the activity thirty-four to sixty-six percent of the time. (JPF 0272.)

[38]It bears noting that Defendant's long-term disability claim profile does not provide any explanation regarding which of Plaintiff's responsibilities and duties constitute the main duties of her regular occupation. (JPF 0002-03.)

26

treating physicians discussed those duties which she was either able or unable to perform.[39] (*See e.g.,* JPF 0220-22.) Defendant therefore erroneously concluded that Plaintiff's illness did not prevent her from performing the main duties of her occupation, given the absence of any discussion by her treating physicians as to her ability to perform specific occupational duties.[40] Therefore, because

---

[39]In Dr. Betman's April 26, 2002 Attending Physician's Statement, he indicated Plaintiff was unable to use her fingers for word processing, opening file cabinets and pulling out files, and traveling with and setting up equipment and should not do anything that causes severe pain and swelling in her joints. He further noted that Plaintiff was restricted in lifting, carrying, using her hands and feet in repetitive actions and movements, crawling, and climbing. (*Id.*)

Dr. Betman also indicated in the Attending Physician's Statement that Plaintiff could sit for three to four hours; stand for two hours; and walk for no more than one-half an hour in an eight-hour workday. (JPF 0297.) He further opined that she never expected Plaintiff to return to her prior level of functioning and her prognosis for recovery was poor. (*Id.*) It also bears noting that Dr. Betman failed to specify the date that Plaintiff was first unable to work even though the Attending Physician's Statement requested this information. (JPF 0296.)

Thus, while Dr. Betman opines as to Plaintiff's limitations and restrictions caused by her illness, the Court is left to ponder as to whether these encompass the main duties of her occupation.

[40]Defendant's initial claim denial letter of September 18, 2002 states in pertinent part:

In order to determine disability, we must evaluate your capacity to perform work-related activity comparing the physical requirements of your occupation to the restrictions and limitations, which result from the condition causing the disability. However, the restrictions and limitations must be supported by medical evidence, which means office and treatment records, testing results, therapy notes, consultation reports, operative reports, etc.

. . . .

. . . [T]here are no records from your physicians for any visits during the month of November [of 2001] and your visits in December [of] 2001 and January [of] 2002 do not record any significant restrictions or limitations that would support your inability to perform the main duties of your occupation as defined by this [group] policy.

. . . .

In summary, the medical documentation from Drs. Karimi, [Ramsey-]Goldman, Baber and Betman do not provide any evidence of a significant restriction or limitation that would preclude you from performing the main duties of your occupation . . . (JPF 0170.)

(continued...)

Plaintiff's eligibility for benefits under the group policy depends on whether she is capable of performing the main duties of her occupation, a explanation or discussion regarding these duties is necessary. *Cate,* 965 F.Supp. at 1045-46 (cause remanded because neither the physicians nor the defendant discussed "the duties which [the plaintiff] is able or unable to perform" where the eligibility determination turned on whether the plaintiff was "capable of performing the substantial and material duties of his occupation")

The Court finds that it is unable to decide whether Plaintiff is "total disability" under the

---

[40](...continued)
Defendant's February 14, 2003 letter denying Plaintiff's administrative appeal states in pertinent part:

> In our appeal review process, all previous information submitted, as well as any new information is used in making our determination. After reviewing the file again in its entirety, we have determined that the medical evidence continues to demonstrate a lack of severity of impairment in [Plaintiff's] condition which would have rendered her unable to perform the main duties of her occupation beyond her Elimination Period.
>
> . . . .
> . . . The documentation indicates functional limitations but does not specify what those limitations are.
>
> . . . .
> [Plaintiff] may have some limitation based on the rheumatology notes; however, these notes do not detail her limitations as far as how these limitations affect how she cannot perform the main duties of her occupation, as it appears she is able to do volunteer work, in spite of her pain and depression.
>
> . . . .
> In summary, the medical records that we have been provided with fail to demonstrate a severity of impairment in her condition that would have warranted Total Disability beyond her elimination period, and therefore, we are unable to consider benefits at this time. (JPF 0086-87.)

Thus, while Defendant concludes that the medical evidence fails to establish that Plaintiff is unable to perform the main duties of her regular occupation, there is no discussion or explanation in the administrative record as to what constitutes Plaintiff's main duties and whether she is unable to perform those duties.

group policy because Defendant at the administrative proceedings below failed to engage in a factfinding process that would enable it to determine the main duties of Plaintiff's regular occupation and whether she was unable to perform each of the main duties of that occupation. Accordingly, the Court remands the cause to Defendant for reconsideration and further development of the administrative record to determine if Plaintiff is eligible for benefits under the group policy.[41] *See e.g., Cate,* 965 F.Supp. at 1045-46 (case remanded to plan administrator for reconsideration and

---

[41]It bears noting that the group policy states that an insured must provide the following:

Proof of [the] claim must be provided at the Insured Employee's own expense. It must show the date the Disability started, its cause and degree. It must show any restrictions on performing the duties of the Insured Employee's regular occupation. (JPF 0024, 0063.)

As indicated by this provision of the group policy, Plaintiff bears the burden of proof herein. *Wilkes v. UNUM Life Ins. Co. of Am.,* No. 01-C-182-C, 2002 WL 926279, at *7 (W.D. Wis. Jan. 29, 2002)(*citing Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 179 (7th Cir. 1994)("To recover benefits under § 1132(a)(1)(B), the employee must establish that she has satisfied the conditions necessary for benefits under the plan.") The Court, however, recognizes that, at the same time, ERISA requires a plan administrator to engage in "a reasonable inquiry into a claimant's medical condition and his vocational skills and potential;" however, it does not require "a full-blown investigation." *Wallace v. Reliance Standard Life Ins. Co.,* No. 01-C-0714-C, 2002 WL 32345607, at *5 (W.D. Wis. June 21, 2002)(*citing O'Reilly v. Hartford Life & Accident Ins. Co.,* 272 F.3d 955, 961 (7th Cir. 2001)). Thus, "[b]efore denying benefits, administrators of ERISA plans are required to have enough evidence to allow them to make a reasonable decision." *O'Reilly,* 272 F.3d at 961 (*citing Quinn v. Blue Cross & Blue Shield Ass'n,* 161 F.3d 472, 476-77 (7th Cir. 1998). *See also Quinn v. Blue Cross & Blue Shield Ass'n,* 990 F.Supp.557, 563 (N.D. Ill. 1997)(overturned on other grounds)("[Benefits Committee Secretary's] ignorance of [the plaintiff's] job duties . . . [was] a telling example of [the plan administrator's] failure to fulfill its duty to investigate [the plaintiff's] claim fully.") Herein, Defendant had insufficient evidence from Plaintiff in the record to make a reasonable decision to deny her claim for long-term disability benefits. *Cf. Wallace,* 2002 WL 32345607, at * 5-6 (finding that "defendant undertook a careful investigation of plaintiff's disability status and reached the correct conclusion that plaintiff had failed to establish that he was unable to work at any light duty job and specifically at a job in his former occupation.") *See also Hightshue v. AIG Life Ins. Co.,* 135 F.3d 1144, 1148 (7th Cir. 1998)("[s]eeking independent expert advice [independent medical evaluations] is evidence of a thorough investigation.")

29

further development of the record "[g]iven the absence of any evidence in the record as to the substantial and material duties of [the plaintiff's] occupation, and as to his ability to perform those duties" ); *see also Ranson v. UNUM Life Ins. Co. of Am.*, 250 F.Supp.2d 649, 657 (E.D. Va. 2003)(cause remanded to plan administrator to "address the central inquiry, namely whether [the plaintiff] could perform the 'material and substantial duties' of his regular occupation")[42]; *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 271-74 (4th Cir. 2002)(the starting point of an analysis of whether a claimant can perform each material duty of his regular occupation must be a precise definition of the claimant's job duties to enable the plan administrator to analyze properly whether the claimant's medical condition limited the claimant's ability to perform each of the job duties).

It bears noting that in the prior summary judgment ruling, the Court deemed this to be a situation where the parties could introduce additional evidence at trial in order to permit the Court to make an informed and independent judgment. *Lockhart*, 314 F.Supp.2d at 812 n.38 (*citing Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 n.4 (7th Cir. 1994)). The parties, however, have stipulated to a trial on the papers which in this case encompasses the administrative record and the SSA's disability benefit determination, which disability determination is the only new or additional evidence the parties have presented for the Court's consideration. *See* Joint Stipulation dated July 8, 2004. Remand is appropriate because the administrative record which is inadequate lacks a factual determination with regard to those duties which comprise the main duties of Plaintiff's regular

---

[42]In *Ranson*, the district court found that it was "appropriate to remand this matter to UNUM to undertake the required analysis: UNUM should detail each 'material and substantial' duty of [the plaintiff's] position . . ., and then 'conduct a deliberate, principled, reasoning process' to determine whether the fact that he suffers from neurocardiogenic syncope limits his ability to perform each of these activities." *Ranson*, 250 F.Supp.2d at 658.

occupation and whether she, using medical evidence where possible was unable to perform each of the main duties of that occupation. Accordingly, a benefit eligibility determination cannot be made by the Court. *See e.g., Casey v. Uddeholm Corp.*, No. 92 C 2156, 1995 WL 680154, at *1 (N.D. Ill. Nov. 13, 1995)(case remanded to plan administrator where the factual determinations had not been made is proper, even where the court reviews the plan administrator's decision *de novo*); *cf. Dionida v. Reliance Standard Life Ins. Co.*, 50 F.Supp.2d 934, 942 (N.D. Cal. 1999)("[a]lthough remand is available even on [a] *de novo* review, usually it is not warranted where . . . there is a fully developed record."); *see also Quesinberry v. Life Ins. Co. of North Am.*, 987 F.2d 1017, 1025 n.6 (4th Cir. 1993)(a district court "may exercise its discretion to remand a claim where there are multiple issues and little evidentiary record to review").

## CONCLUSION[43]

In view of the foregoing, this case is remanded to Defendant with instructions to make a benefits eligibility determination. Defendant shall inform the Court of its benefits eligibility determination as soon as is practicable. The Court retains jurisdiction over this action during the remand. *See e.g., Robyns v. Reliance Standard Life Ins.*, No. IP98-1241-C-H/G, 2001 WL 699886, at *3 (S.D. Ind. May 17, 2001)(district court retained jurisdiction over case during remand to plan administrator for administrative determination).

---

[43]In view of the Court's ruling herein, it is deemed unnecessary to consider Plaintiff's and Defendant's other arguments raised herein.

ENTER:

IAN H. LEVIN
United States Magistrate Judge


Dated: March 1, 2005