**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LEONORA LOCKHART             )
                                       )
          **Plaintiff,**          )
                                       )    **No.  03 CV 1745**
         **v.**                )
                                       )    **HONORABLE DAVID H. COAR**
JEFFERSON PILOT FINANCIAL INSURANCE CO.,    )
                                       )
          **Defendant.**        )

## MEMORANDUM OPINION AND ORDER

Pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA") of 1974, 29 U.S.C. § 1123(a)(1)(B), Plaintiff Leonora Lockhart ("Plaintiff") seeks judicial review of Defendant Jefferson Pilot Financial Insurance Company's ("Defendant") decision to deny her long-term disability insurance benefits under a group policy issued to her employer, the Illinois Hospital Association ("IHA").  Following several years of litigation, including a trial on the papers before Magistrate Judge Levin that ended with a remand for further fact development, the parties have filed cross-motions for judgment. These motions come before the Court now.

## I.      BACKGROUND

### a.  Introduction

The facts of this case have been amply and well documented in Judge Levin's Amended Memorandum Opinion and Order ("Amended Order").  *Lockhart v. Jefferson Pilot Financial Ins. Co.*,  No. 03 C 1745, 2005 WL 914446 (N.D.Ill. March 29, 2005).  The Court will restate here the most pertinent facts, drawing heavily from Judge Levin's summary.

Plaintiff, an attorney, was employed in a non-legal position at the IHA as a Risk Management Consultant from April 24, 1997 through January 31, 2002. Parties Joint Appendix, Dkt. No. 69 ("JPF") 0270, 0285. Plaintiff was terminated from her position at the IHA on January 31, 2002. JPF 0245.

### b. Plaintiff's Job Duties

In her capacity as a Risk Management Consultant ("RMC"), Plaintiff's was responsible for providing risk management services to insured physicians and member/client hospitals in order to assist them in developing and maintaining effective internal risk management programs, according to the RMC position description as provided by the IHA. JPF 0275. The position description also provides an "outline of responsibilities" which delineates that Plaintiff was responsible for performing consultative services for client inquiries regarding risk management and medical-legal concerns; identifying problems, patterns and trends in hospitals or physician practices and recommending corrective action to prevent patient harm and minimize financial loss; providing educational programs for clients in the form of in-service programs, seminars and risk management committee meetings; performing on-site services which include risk management surveys and audits of clinical areas and follow-up on risk management issues; conducting underwriting site visits at applicant member hospitals; and publishing a quarterly newsletter for insured physicians. *Id.* Plaintiff's position description indicated she was required to use a computer for word processing and other types of computer programs, copy machine, calculator and dictating equipment. JPF 0276. She was also required to work additional morning and evening hours and travel approximately thirty-five percent of the time. *Id.*

In addition, a long-term disability claim job analysis completed by Defendant indicated that Plaintiff was required to do many of the same activities as described in the position

description; such as, typing on a computer, using a telephone and traveling by automobile.  JPF

0272-73.  With regard to the other physical aspects of Plaintiff's position, the job analysis also

indicated she needed to frequently stand, walk and sit, with "frequently" defined to mean a task

that the individual performs 34-66% of the time.  JPF 0272-73.  Furthermore, the job analysis

indicated Plaintiff frequently needed to relate to others, engage in written and verbal

communication, make independent judgments and exert math and language reasoning skills. JPF

0272.

### c.   Termination and Disability Claim

Plaintiff's employment with the IHA was terminated on January 24, 2002 due to poor

performance.  In the termination letter, Cheryl Church, Plaintiff's supervisor, wrote that the

termination was due to "ongoing concerns about [Plaintiff's] limited ability to recognize and

understand clinical risk management issues and your poor productivity."  JPF 0245.

Following Plaintiff's termination, Plaintiff retained an attorney who worked with counsel

for the IHA in developing two letters: a letter of recommendation and a letter regarding her

alleged disability.  JPF 0165-66.  In a letter dated April 9, 2002, the IHA attorney agreed to the

following language in a letter regarding Plaintiff's alleged disability:

> [Plaintiff] worked for the Illinois Hospital and Health Systems Association as a Risk
> Management Consultant from April 24, 1997 through January 31, 2002. At the end of her
> employment, it appeared that [Plaintiff's] performance was adversely affected by her
> medical condition.

JPF 0165-66.

Plaintiff had participated in the IHA's Long Term Disability Plan ("Plan"), which is an

employee welfare benefit plan established and maintained by the IHA in accordance with

ERISA.[1]  JPF 0015-0045, 0051-0083.  The Plan's long-term disability coverage is provided

pursuant to a group policy issued to the IHA by Defendant.  JPF 0015-45, 0051-83.  An insured's

coverage under the group policy ends when the insured is no longer employed by the IHA.  JPF

0015, 0016, 0028, 0054, 0067.  The group policy provides an insured, upon termination of his or

her employment, with the opportunity to obtain converted long term disability insurance (i.e.,

individual policy).  JPF 0029, 0069.  Further details about the group policy are in the discussion

section below.

Following Plaintiff's termination on January 31, 2002, she was no longer a covered

insured under the group policy.  On February 28, 2002, Defendant extended the time period by

thirty-one days for former employees to exercise their conversion privilege under the group

policy.  JPF 0289.  Plaintiff inquired about converting her group disability insurance coverage

into individual coverage, but she decided not to convert (and continue) her coverage. JPF 0290-

91.  On July 24, 2002, Plaintiff submitted a claim for long-term disability benefits alleging she

was disabled due to psoriatic arthritis[2] since January 24, 2002, the last day Plaintiff alleges she

was able to work due to her disability.[3]  JPF 0281-84.  In her claim for benefits, Plaintiff alleged

that she had had pain and stiffness in her hands during 2000 and 2001 and, more recently, she

had experienced pain in her feet and neck.  JPF 0283. Plaintiff indicated that her pain and

---

[1] The Plan constitutes an "employee welfare benefit plan" as defined by 29 U.S.C. § 1002(1).
Plaintiff was covered under the Plan as a "participant" as defined by 29 U.S.C. § 1002(7).
[2] "Psoriatic arthritis is a form of joint inflammation that occurs in some people who have
psoriasis of the skin or nails. Inflammation usually affects joints of the fingers and toes, although
other joints, including the hips and spine, are often affected as well. The joints may become
swollen and deformed when inflammation is chronic. Arthritis often involves joints less
symmetrically than in rheumatoid arthritis and involves fewer joints. The joints at the end of the
fingers adjacent to the diseased nails may be involved. The skin and joint symptoms sometimes
appear and disappear together." Robert Berkow *et al., The Merck Manual of Medical
Information-Second Home Edition* 375 (2d ed. 2003).
[3] Plaintiff's claim for benefits indicates that the date she was first unable to work was November
14, 2001.  JPF 0281.

stiffness were worse in the mornings and she had to lie in bed for thirty minutes to an hour before she felt well enough to get out of bed. *Id.* Plaintiff further stated that her condition made it difficult for her to get dressed and attend to her personal hygiene which included bathing as well as brushing her teeth and hair. *Id.*

In her claim for disability benefits, Plaintiff indicated that because her joint pain was worse during cold or wet weather, she frequently went to warmer locales during 2000 and 2001. JPF 0283. Plaintiff also stated that "fatigue is a tremendous problem" and she did not sleep well due to joint pain and muscle aches. *Id.* She indicated that her medications cause side-effects which include bronchitis, sinusitis, conjunctivitis, nosebleeds, and psoriatic flare-ups. Plaintiff indicated that these side-effects were not disabling; however, they were troublesome and needed to be treated. JPF 0283-84. Moreover, Plaintiff stated that she had a history of depression and that her physical limitations prevented her from walking which was one way she managed her depression and stress. JPF 284. She further indicated that before she stopped working, she avoided out-of-town travel as much as possible, had difficulty in getting files out of cabinets, was very tired after sitting at a desk for extended periods of time, came in as late as possible due to early morning pain and stiffness, and could not stuff packets for mailings. *Id.*

### d. Medical Evidence

Plaintiff supported her claim for long-term disability benefits (and her later appeal of Defendant's denial of those benefits) with numerous medical records and reports from her treating physicians. These physicians are: (1) Dr. Shelly L. Betman, M.D., Plaintiff's internist, who filled out Plaintiff's Attending Physician's Statement form for her disability claim; (2) Dr. Rosalind Ramsey-Goldman, M.D., Plaintiff's treating rheumatologist; (3) Dr. Farid Karimi, Plaintiff's treating psychiatrist after November 5, 2001; (4) Dr. Robert Lawton, M.D., from

whom Plaintiff primarily received psychiatric care before being treated by Dr. Karimi[4]; and (5)

Dr. Mary Szatkowski-Pritikin, M.D., Plaintiff's ophthalmologist. The administrative record is

voluminous, and not every medical record supports Plaintiff's claim that she was totally disabled

as of January 24, 2002. Since Plaintiff's claim hinges on the onset date of her disabling

condition, the most pertinent documents/events are arranged chronologically below:

- **June 19, 1997 through October 5, 2001.** As indicated by Dr. Lawton's numerous sessions notes, Plaintiff was treated for a major depressive disorder during this time period and was prescribed medications including Effexor and Ritalin for her disorder. JPF 0173-85. Dr. Lawton saw Plaintiff six times in 2001: January 11, 2001; March 7, 2001; May 7, 2001; June 20, 2001; August 30, 2001; and October 5, 2001. At the last session, on October 5, 2001, Dr. Lawton noted that Plaintiff is "[d]oing reasonably well but she is beginning to dread winter" and she is "awakening" from a "transient dysphoria." JPF 0175.

- **October 9, 2001.** Treatment notes from Dr. Ramsey-Goldman state: "Since last visit ha[ve] noted more swelling [and] pain. Not limiting her from working. No new patches of psoriasis. JPF 0109. The notes also indicate that Plaintiff no longer needed to take Vioxx[5]; however, she still needed to take Arava, Effexor,[6] Ritalin,[7] and Allegra.[8] JPF 0109. It was also noted that Plaintiff has active psoriatic arthritis and moderate synovitis with deformity and she may need to take Enbrel or Remicade which are medications used to treat active rheumatoid arthritis. JPF 0112.

- **October 9, 2001**. Plaintiff underwent x-ray evaluations of her wrists and hands which were ordered by Dr. Ramsey-Goldman. JPF 0147-50. Regarding Plaintiff's x-ray evaluation of her hands, Dr. Earl Nudelman, M.D., the attending radiologist, reported that:

    Joint space narrowing is present at the interphalangeal joints of the hand. There is soft tissue prominence, marked joint space narrowing, marginal

---

[4] Plaintiff was treated by Dr. Robert Lawton and she also received treatment from Drs. Waters and Kniffin during this time period. JPF 0173-85.

[5] Vioxx is a nonsteroidal anti-inflammatory pain killer used in the treatment of osteoarthritis and other types of acute pain. *PDR Family Guide,* at 738.

[6] Effexor is used for the treatment of continuing depression that interferes with daily functioning. *PDR Family Guide,* at 241.

[7] Ritalin is typically used for the treatment of attention deficit hyperactivity disorder in children; however, it is also used to treat other diseases and conditions. *PDR Family Guide,* at 594.

[8] Allegra is an antihistamine used to treat the symptoms associated with hay fever. *PDR Family Guide,* at 29.

sclerosis, and osteophyte formation present at the distal interphalangeal joints of both hands. No definite bone erosion or bone destruction is seen. No fracture is seen. Some minor periarticular deossification is noted at the interphalangeal joints of the hand, most marked at the proximal interphalangeal joints.

JPF 0148.  With respect to Plaintiff's left wrist, Dr. Nudelman indicated that "[a] slightly coarse trabecular pattern is identified compatible with some bony deossification. No joint space narrowing, significant osteophyte formation, or bone erosion is seen at the left wrist. No fracture is seen." JPF 0149.  Moreover, with regard to Plaintiff's right wrist, Dr. Nudelman found that, "[a] slightly coarse trabecular pattern is identified compatible with some bony deossification. No bone erosion or significant osteophyte formation is present at the right wrist. No abnormal calcifications are present. No fracture is seen." JPF 0150.

- **December 5, 2001.**[9]  In the initial psychiatric/psychological evaluation pertaining to Plaintiff, Dr. Karimi indicated that Plaintiff's attention and concentration were "good/pass" and her memory, reasoning and judgment were "good." JPF 0217.  Dr. Karimi also indicated in his initial evaluation that Plaintiff had a global assessment of functioning ("GAF") score of 60.[10]  *Id.*  Otherwise, the initial psychiatric evaluation, progress notes and medication record submitted by Dr. Karimi are essentially illegible. JPF 0208, 0212-0217.

- **December 24, 2001**.  Plaintiff sought treatment from Dr. Betman for fatigue and a sore throat.  JPF 0238.

- **December 28, 2001**.  Plaintiff underwent blood tests which were ordered by Dr. Betman. JPF 0232-34.

- **January 2, 2002**.  Dr. Karimi's progress notes indicate that Plaintiff is "feeling [fifty percent] better." JPF 0215.

- **January 7, 2002.**  Plaintiff's ophthalmologist Dr. Szatkowski-Pritikin noted Plaintiff's active rheumatoid arthritis, blurry vision, inability to wear contact lenses and burning eyes.  JPF 0156-60.

---

[9] The date on the document is obscured, and there appears to be some confusion between the parties as to the exact date that Plaintiff's treatment under Dr. Karimi began, but the medication record confirms that treatment began on December 5, 2001.  JPF 208.

[10] GAF measures an individual's overall level of psychological, social and occupational functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 32 (rev. 4th ed.2000). A GAF score of 51 to 60 is intended to identify an individual with "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

- **January 8, 2002**. Plaintiff saw Dr. Betman for a follow-up visit. Dr. Betman indicated that Plaintiff should return in six weeks. JPF 0236.

- **January 30, 2002** Dr. Karimi's progress notes indicate that Plaintiff is "hopeful for [the] future" and "feeling better." *Id.*

- **April 17, 2002.** Dr. Karimi's progress notes indicate that Plaintiff was "doing well." JPF 0214.

- **April 26, 2002**. Dr. Betman's Attending Physician's Statement for Long Term Disability Claim indicated that Plaintiff has severe deformity, swelling and tenderness in her DIP joints (joints in the fingertips) as well as pain and swelling in her PIP joints (joints in the middle of the finger) in both of her hands. JPF 0296. Dr. Betman indicated that Plaintiff was unable to use her fingers for word processing, opening file cabinets and pulling out files, and traveling with and setting up equipment and should not do anything that causes severe pain and swelling in her joints. JPF 0297. Dr. Betman further noted that Plaintiff was restricted in lifting, carrying, using her hands and feet in repetitive actions and movements, crawling, and climbing. *Id.* Dr. Betman indicated that in an eight-hour workday, Plaintiff could sit for three to four hours; stand for two hours; and walk for no more than one-half an hour. JPF 0297. Dr. Betman further opined that she never expected Plaintiff to return to her prior level of functioning and that her prognosis for recovery was poor. *Id.* Dr. Betman, however, failed to specify the date that Plaintiff was first unable to work even though the Attending Physician's Statement requested this information. Dr. Betman failed to provide any information in the box labeled "Date you believe the patient was first unable to work (Month, Day, Year)." JPF 0296.

- **April 30, 2002.** Treatment records from an office visit with Dr. Ramsey-Goldman reflect that Plaintiff continued to have joint pain and was unable to drive because of pain in her hands and neck. JPF 0105. Plaintiff, however, was able to perform activities of daily living, but was having difficulty with buttons and had two hours of morning stiffness. *Id.* Treatment notes further indicated that Plaintiff's psoriatic arthritis was "not well controlled on Arava or Enbrel alone." JPF 0108. Dr. Ramsey-Goldman noted that there was "only [a] partial response" to the Enbrel and there was "significant [joint] pain and functional limitation in [the] dominant [left] hand." *Id.* There was also evidence of synovitis in Plaintiff's DIP joints, decreased flexion in her left wrist, and decreased range of motion in her neck. *Id.* Dr. Ramsey-Goldman noted that the disease was still active and was contemplating adding methotrexate to Plaintiff's medications. *Id.*

- **May 31, 2002.** Dr. Ramsey-Goldman submitted a letter to Dr. Betman at Plaintiff's request. JPF 0222. In the letter, Dr. Ramsey-Goldman stated:

  > We have been seeing [Plaintiff] since July of 1998, and during this time there has been significant progression of her disease [psoriatic arthritis] with loss of function, particularly in the small joints of the hands and in the wrists. We have

added several medications, and not all of these have been successful. She was on Arava,[11] and this did not result in a significant enough improvement, and in October of 2001, we recommended that she switch to Enbrel,[12] which she did do shortly thereafter. She has had some improvement, but not complete improvement, on the Enbrel, and now we are considering adding methotrexate.[13] Despite all of these treatments, we have documented joint damage in the small joints of both hands.[14]

On her examination, this would be consistent with her complaints of limited function so that she cannot do her work, and also the amount of inflammation, fatigue and other constitutional symptoms would also limit her ability to work.

Therefore, I would support her claim of disability when she was unable to work in November, which was shortly after her visit with us in October, and that the official disability date starts in January. This is all consistent with our evaluation and her incomplete response to treatment and the documentation of loss of function and joint damage.

- **June 27, 2002.** Dr. Karimi provided a summary of Plaintiff's psychiatric status, which states as follows:

[Plaintiff's] psychiatric status is currently fragile and quickly decompensates further under minimal stress. [Her] current depressive symptoms include decreased energy, hopelessness, helplessness, decreased concentration and constant fatigue. Due to the severity of her condition and symptoms, Plaintiff cannot maintain concentration, deal with work stresses or interact with co-workers or others in an emotionally stable manner. Even extremely low levels of stress manifest anxiety and depressive symptoms. Currently, it would not be possible for [Plaintiff] to perform any kind of work duties. Despite regular psychotherapy and psychotropic medications, [Plaintiff's] condition has not significantly improved.

---

[11] Arava is used in the treatment of rheumatoid arthritis. *The PDR Family Guide to Prescription Drugs* (hereinafter " *PDR Family Guide* ") 52 (9th ed.2002).

[12] Enbrel is used to treat the symptoms of moderate to severe rheumatoid arthritis when other drugs have proven to be inadequate. *PDR Family Guide,* at 252.

[13] Methotrexate is used to treat rheumatoid arthritis when other treatments have proven to be ineffective. *PDR Family Guide,* at 402. It is sometimes used to treat very severe and disabling psoriasis (a skin disease characterized by thickened patches of red, inflamed skin which is often covered by silver scales). *Id.*

[14] The factual claims in Dr. Ramsey-Goldman's May 31, 2002 letter, are supported by medical records dating back to July 7, 1998. JPF 0097-0151. These additional medical records were included in Plaintiff's appeal letter. JPF 0092. Plaintiff's attorney also noted that a portion of Dr. Ramsey-Goldman's medical records were missing because "the records jump from October 2001 to April 2002, with a notation that the old chart was not available." Plaintiff's attorney further indicated that "[w]e know for certain of a visit on January 29, 2002; and we are continuing to locate that record." JPF 0092. This record still has not been located. JPF 0092.

JPF 0221. Dr. Karimi further noted that he diagnosed Plaintiff as suffering from a major depression (recurrent and severe) and indicated Plaintiff was taking Paxil, Effexor and Ritalin for her depression. JPF 0221. He noted that Plaintiff's medications had "produced minimal response" and she "continues to be depressed with significant anxiety related symptoms." *Id.*

- **July 16, 2002**. Treatment notes from Dr. Ramsey-Goldman indicate that Plaintiff has active psoriatic arthritis, should continue with her current medications including Enbrel and should try using wrist splints. JPF 0104. Dr. Ramsey-Goldman noted *inter alia* that Plaintiff's hands are showing chronic bony hypertrophy at her DIP joints; she has swelling, pain and difficulty walking; and she has pain in her neck and hands. JPF 0101, 0103. She further indicated Plaintiff had co-morbid conditions of depression and a sleep disorder (JPF 0104) and noted Plaintiff has fibromyalgia,[15] her depression is "better," her fatigue is "mild," and she is in "no acute distress." JPF 0101, 0102. Dr. Ramsey-Goldman also indicated that Plaintiff was unemployed and "very happy with volunteer work." JPF 0101.

### e. Procedural History

On September 18, 2002, Defendant informed Plaintiff by letter that it was denying her claim for long-term disability benefits based on the provisions of the group policy. JPF 0169-71. On October 17, 2002, Plaintiff (who was represented by an attorney) provided Defendant, by letter, with her notice of appeal of the September 18, 2002 denial of her disability claim. JPF 0162-63. On January 24, 2003, Plaintiff, through her attorney and by letter, submitted her administrative appeal asserting that Defendant's decision to deny her long-term disability benefits was erroneous because Plaintiff's condition was so severe that it rendered her unable to work. JPF 0090-95. After reviewing and consulting with a registered nurse regarding Plaintiff's administrative appeal, Defendant denied Plaintiff's appeal in a letter dated February 14, 2003. JPF 0001-02, 0086-88.

On October 10, 2003, the Social Security Administration (hereinafter "SSA") notified Plaintiff that she was entitled to receive disability benefits and, in accordance with the agency's rules, she was disabled as of January 31, 2002.

---

[15] Treatment notes from June 5, 2001 indicate that Plaintiff has fibromyalgia. JPF 0116.

On March 11, 2003, Plaintiff filed this lawsuit seeking judicial review of Defendant's denial of long-term disability benefits pursuant to ERISA. Judge Levin denied both parties' cross-motions for summary judgment and then decided the case as a trial on the papers. In the Amended Order, Judge Levin remanded the case for further fact development. Reasoning that Plaintiff's eligibility for benefits under the group policy depended on whether she was capable of performing the main duties of her occupation, the judge held that an explanation or discussion regarding these duties was necessary. However, "there is no discussion or explanation in the administrative record as to what constitutes Plaintiff's main duties and whether she is unable to perform those duties." *Id.* at 28, n. 40. The medical evidence contained in the administrative record merely "delineates the various limitations and restrictions Plaintiff experiences as a result of her illness and offers conclusory opinions as to whether Plaintiff was disabled." *Id.* at 26. The Court was unable to decide whether Plaintiff was totally disabled under the group policy

> . . . because Defendant at the administrative proceedings below failed to engage in a factfinding process that would enable it to determine the main duties of Plaintiff's regular occupation and whether she was unable to perform each of the main duties of that occupation.

*Id.* at 28. Accordingly, the Court remanded the cause to Defendant for reconsideration and further development of the administrative record to determine if Plaintiff is eligible for benefits under the group policy. *Id.* at 28-29.

### f.  Additional Evidence on Remand

On remand, both parties produced more evidence pursuant to Judge Levin's directive. Plaintiff added portions of her Social Security disability claim record (JPF 0581-0800) and a vocational evaluation prepared by rehabilitation counselor/licensed clinical professional counselor Thomas A. Grzesik (JPF 0417, 0463-0487) describing Plaintiff's job functions in

detail. Defendant included a statement by Cheryl Church, the IHA's senior director of risk management and Plaintiff's former supervisor, also describing Plaintiff's job duties but providing a very different picture of Plaintiff's work than Plaintiff's evidence. JPF 0818-0820. Defendant also produced statements by an independent rheumatologist (Dr. Tonya Lumpkins) and an independent psychiatrist (Dr. Marcus Goldman) who evaluated Plaintiff's medical records. JPF 0828-31, 0836-42.

### 1. Statement by Thomas A. Grzesik

Grzesik interviewed Plaintiff on May 17, 2005 for the purpose of determining her employability, and produced a letter to Plaintiff's attorneys on June 21, 2005 documenting his findings. Grzesik's letter mostly summarizes the reports of others, namely the IHA job description and the long term disability form filled out by Defendant, both described above in Section I.b, and Plaintiff's doctors' assessments of Plaintiff's physical abilities, also described above. The only original material Grzesik's statement was Plaintiff's own descriptions of her employment as a Risk Management Consultant ("RMC") with the IHA.

Plaintiff described her job to Grzesik as one that required her to provide consultation to hospital clients and physician clients. As part of her job, Plaintiff was required to research the requirements for staffing a department such as an emergency room, obstetrics and anesthesiology. JPF 479. She was required to establish and/or reverse policies and practices of hospitals, by analyzing the hospital's house rules (e.g. pertaining to the amount of time a surgeon should take to get to the hospital for emergencies) and its standard of care. *Id.* Plaintiff told Grzesik that she performed research using a computer and electronic resources, and drafted correspondence in a word processing program, tasks which required her to use a keyboard and mouse frequently. JPF 480. Plaintiff was also required to retrieve paper files from a tightly

packed filing cabinet, which caused her to experience severe pain in her fingers due to her psoriasis. *Id.* Once every two or three weeks, Plaintiff went on business-related trips and stayed away for up to three days. Her work travel required her to drive up to 300 miles to meet with clients, and bring audiovisual equipment (such as a laptop and projector) and printed materials with her. Her work required her to lecture and make presentations to clients on ways to decrease risk in a medical office environment. *Id.*

Grzesik classified the position of RMC as "skilled and light in physical demand," but noted that the U.S. Department of Labor, Dictionary of Occupational Titles and O*Net (an occupational information database) did not have job descriptions for Plaintiff's occupation. JPF 0481.

## 2. Statement by Cheryl Church

On September 8, 2005, Plaintiff's former supervisor Cheryl Church wrote a letter to Defendant describing the main duties of Plaintiff's job. Church has been employed as a RMC at the IHA since 1986. Church described Plaintiff as one of four RMCs. Church described Plaintiff's position as having six main duties requiring Plaintiff to

(1) Utilize mental and analytical functioning capabilities in verbally providing risk management services and advice to member physicians and member hospitals. This activity required mentally evaluating client inquiries and mentally formulating appropriate responses, and then talking on the phone with clients to communicate those responses. It also required Plaintiff to read manuals and risk management regulations and identify and analyze applicable state statutes.
(2) Publish a quarterly newsletter. This required Plaintiff to determine the topics in a two-page newsletter, direct or delegate the preparation of articles or research and write the articles herself.
(3) Attend IHA staff meetings.
(4) Provide (by phone) risk management consulting services to six Illinois hospitals.
(5) Visit each of the six Illinois hospitals once a year. Church stated that, contrary to the RMC job description stating that travel accounted for 35% of work time, travel duties only constituted about 5% of an RMC's job.

(6) Attend two meetings per year in Chicago. This required Plaintiff to ride in a car with Church to Chicago from Naperville, IL, and listen and talk at the meetings.

JPF 0818-0820. Church stated that "75% to 80% of [Plaintiff's] main duties involved the in-the-office activity of mental processing, analyzing and thinking about risk management issues . . . ." JPF 0819. Approximately 25% to 30% of Plaintiff's main duties involved verbal communications with clients and other RMCs; to the extent that written materials needed to be prepared and distributed, Plaintiff had the use of a Dictaphone and secretary. *Id.*

### 3. Social Security Disability Claim

Plaintiff's application for disability benefits through the Social Security Administration ("SSA") was approved on October 10, 2003. Plaintiff included portions of her SSA record as evidence on remand. JPF 0581-0800. A Psychiatric Review Technique form was completed on September 12, 2003, by Terry A. Davis, M.D., as part of the SSA disability determination. The form stated that Plaintiff suffered from Depressive syndrome characterized by a pervasive loss of interest in almost all activities, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. JPF 0582-83. The form stated that Plaintiff's mental disposition restricted her activities of daily living and made it difficult for Plaintiff to maintain concentration, persistence, or pace to a "marked" degree. JPF 0586. The SSA found that Plaintiff was disabled as of January 31, 2002, but there is no explanation in the record as to how the determination of the onset date of her disability was made.

### 4. Independent Physicians' Evaluations

Both Dr. Lumpkins and Dr. Goldman were given the entire administrative record and asked to evaluate whether the medical records establish that Plaintiff was totally disabled prior to January 31, 2002. Neither doctor examined Plaintiff.[16]

Dr. Lumpkins summarized the information available in the medical records, covering dates of service from 1998 through 2004. Dr. Lumpkins noted that "[t]he medical records support the disease diagnosis, appropriate rheumatologic treatment and follow-up in addition to the complications of medications and the intermittent nature of disease flares. The x-rays fail to document progression of the disease as is evident on the right hand done 12/14/2004 that noted the changes were stable since 2001." JPF 0839. In addition, "the physical examinations include the involvement of the knees and feet which would contribute to the need to change position frequently to avoid prolonged static positions that could contribute to stiffness and pain. The claimant would however, be expected to be able to sit for six to eight hours, stand and walk two to four hours as need [sic] with the ability to change positions." *Id.* Dr. Lumpkins concluded that "[t]he medical record document [sic] a diagnosis of psoriatic arthritis that created mild impairment in the physical function of the claimant, but fails to document sufficient disease activity as to render the claimant incapable for performing the routine physical duties of a sedentary position as described in the letter dated 9/8/2005 from Cheryl Church." JPF 0840.

Dr. Goldman found that the "overwhelming majority of the data" was related to Plaintiff's psoriatic illness, not her depression. JPF 0825. He then summarized what depression-related data was available, repeating the facts from the notes from Dr. Karimi and other mental health providers described in the sections above. Dr. Goldman noted that "what can be noted

---

[16] Because neither Dr. Goldman nor Dr. Lumpkins examined Plaintiff, each of their reports consists of a review of the medical record, a consideration of Plaintiff's job duties, and speculation about whether the medical records show functional limitations matching Plaintiff's job duties. As such, they are of limited evidentiary utility.

with some certainty is that this claimant has a chronic, persistent, largely unchanged series of poorly defined complaints and dysphoria, very likely dating back at least 20+ years. The severity of the issues and their impact on her ability to work has not been established, as the overwhelming majority of data are subjective, poorly organized, and cursory." JPF 0829. Dr. Goldman stated that "the data do not support psychiatric debility for the date in question. The information is cursory. There are no data detailing global psychiatric functioning or how her subjective complaints would impair her ability to work. For the dates in question, there are few legible mental status examinations for review in the clinical notes." JPF 0830. Dr. Goldman concluded that the medical records do not support a functional impairment respect to Plaintiff's mental capabilities on or before January 31, 2002.

Based on the additional evidence produced on remand, Defendant again denied Plaintiff's claim for benefits on November 7, 2005. As a result, Plaintiff moved to reinstate this case on November 11, 2005.

## II.    STANDARD OF REVIEW

This case is before the Court for decision as a trial on the papers. The parties have submitted trial briefs in this matter and have stipulated to an administrative record which constitutes the record in this case. *See* Joint Stipulation filed July 8, 2004. *See e.g., Dugan v. R.J. Corman R.R. Co.,* 344 F.3d 662, 665 (7th Cir. 2003)(*citing Hess v. Hartford Life & Accident Ins. Co.,* 274 F.3d 456, 461 (7th Cir.2001)("a trial on a stipulated paper record is equivalent to a conventional trial on (largely) oral evidence"); *see also Brach's Confections, Inc. v. McDougall,* 320 F.Supp.2d 726 (N.D. Ill. 2004)(ERISA case decided by means of a trial on the papers).

In determining whether an individual is entitled to benefits, a court normally examines the plan documents and interprets them *de novo* under federal rules of contract interpretation.

*O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 959 (7th Cir. 2001). However, if the plan gives the administrator discretionary authority to interpret the plan and to make eligibility determinations, a court will overturn that decision only if it is arbitrary and capricious. *Id.* (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). In this case, the parties have also agreed that the *de novo* standard of review is applicable. *Lockhart v. Jefferson Pilot Fin. Ins. Co.,* 314 F.Supp.2d 797, 811 (N.D.Ill. 2004). In cases involving the appeal of the denial of disability benefits pursuant to ERISA, where the district court applies a *de novo* standard of review, "the district courts are not *reviewing* anything; they are making an independent decision about the employee's entitlement to benefits." *Diaz v. Prudential Ins. Co. of America*, 499 F.3d 640, 643 (7th Cir. 2007). As the Seventh Circuit stated in *Diaz*,

> In the administrative arena, the court normally will be required to defer to the agency's findings of fact; when *de novo* consideration is appropriate in an ERISA case, in contrast, the court can and must come to an independent decision on both the legal and factual issues that form the basis of the claim. What happened before the Plan administrator or ERISA fiduciary is irrelevant. See *Patton v. MFS/Sun Life Financial Distributors, Inc.,* 480 F.3d 478, 485-86 (7th Cir. 2007). That means that the question before the district court was not whether [Defendant] gave [Plaintiff] a full and fair hearing or undertook a selective review of the evidence; rather, it was the ultimate question whether Plaintiff was entitled to the benefits he sought under the plan.

499 F.3d at 643. The Plan in this case places the burden of proving the disability on the claimant:

> Proof of [the] claim must be provided at the Insured Employee's own expense. It must show the date the Disability started, its cause and degree. It must show any restrictions on performing the duties of the Insured Employee's regular occupation.

JPF 0024, 0063. *See also Wilkes v. UNUM Life Ins. Co. of Am.,* No. 01 C 182, 2002 WL 926279 at *7 (W.D.Wis. Jan. 29, 2002) (*citing Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 179 (7th Cir.1994) ("To recover benefits under § 1132(a)(1)(B), the employee must establish that she has satisfied the conditions necessary for benefits under the plan.").

## III.    DISCUSSION

Plaintiff contends that she is entitled to long-term benefits under the group policy because, as of January 24, 2002, she was no longer able to perform her job duties due to severe symptoms of pain and fatigue caused by psoriatic arthritis, fibromyalgia, and depression.  Pl.'s Brief 1.  Plaintiff contends that despite the overwhelming medical evidence of her disability, Defendant denied both her initial claim for benefits and administrative appeal.  Defendant, on the other hand, asserts that Plaintiff has failed to satisfy her burden of proving that she was "totally disabled" from all of the main duties of her occupation prior to the time her employment with the IHA was terminated on January 31, 2002.

The group policy defines "Total Disability" and "Totally Disabled" as follows:

> 1. During the Elimination Period [180 days] and Own Occupation Period [48 months], it means that due to an Injury or Sickness that the Insured Employee is unable to perform ***each of the main duties*** of his or her regular occupation.
>
> 2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of any gainful occupation which his or her training, education or experience will reasonably allow.

JPF 0016, 0022, 0030, 0054, 0060, 0071 (emphasis added).  An Insured Employee's main duties or material and substantial duties are those job duties which:

> 1.  are normally required to perform the Insured Person's regular occupation; and
> 2.  cannot reasonably be modified or omitted.  It includes those main duties as performed in the national workforce; not as performed for a certain firm or at a certain work site.

JPF 0021, 0059.  In contrast, the group policy defines "Partially Disabled" or "Partial Disability" as follows:

> 1. During the Elimination Period [180 days] and Own Occupation Period [48 months], it means that due to an Injury or Sickness the Insured Employee:
>> (a) is unable to perform ***one or more of the main duties*** of his or her regular occupation, or is unable to perform such duties full-time; and

(b) is engaged in Partial Disability Employment.[17]

2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee:

(a) is unable to perform ***one or more of the main duties*** of any gainful occupation which his or her training, education or experience will reasonably allow; or is unable to perform such duties full-time; and

(b) is engaged in Partial Disability Employment.

JPF 0016, 0021, 0031, 0054, 0059, 0072.  Plaintiff did not seek partial disability benefits but rather total disability benefits.  As Judge Levin discussed in his Amended Order, the central disputes in this case regard (1) Plaintiff's main duties for her occupation and (2) whether Plaintiff met her burden of proving that by January 24, 2002, she could not perform "each of her main duties."

Plaintiff points to documents in the administrative record as evidence of her total disability, but these are not conclusively persuasive.  Plaintiff argues that the fact that the SSA determined her to be eligible for disability benefits under this definition of disability, which is more stringent than the group policy definition, is evidence that Defendant erred when it determined her to be ineligible for long term disability.  Section 423(d)(1)(A) of Title 42 of the United States Code defines "disability" for purposes of the SSA as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  In addition,

[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in

---

[17] Partial Disability Employment means the Insured Employee is working at his or her own or any other occupation; but because of a Partial Disability:

1. the Insured Employee's hours or production is reduced;
2. one or more main duties of the job are reassigned; or
3. the Insured Employee is working in a lower-paid occupation.

His or her current earnings must be at least 20% of Predisability Income, and may not exceed the percentage specified in the Partial Disability Benefit section.  JPF 0021, 0059.

any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2).  Plaintiff cites a few cases where courts have found SSA determinations of disability to be evidence of disability for purposes of plans covered by ERISA.  *See, e.g.*, LaBarge v. Life Ins. Co. of North America, No. 00 C 512, 2001 WL 109527 at *8 (N.D. Ill. Feb. 6, 2001) (holding that the findings of the Social Security Administration is compelling evidence of plaintiff's disability).  However, there is no hard and fast rule in the Seventh Circuit that a SSA disability determination must be given evidentiary weight for an ERISA benefits claim.  Here, reliance on the SSA disability determination would be misplaced.  Athough the SSA determined Plaintiff's disability to have a January 31, 2002 onset date, the determination was actually based on a September 12, 2003 psychiatric evaluation that found Plaintiff to suffer from depression that limited her functioning to the point of disability.  Nothing in the administrative record explains why the SSA dated Plaintiff's disability to January 31, 2002, and a psychiatric evaluation more than eighteen months after Plaintiff's termination does little to assist this court in determining whether Plaintiff was disabled *at the time of her termination*.  The SSA determination of disability is certainly relevant, but is not the smoking gun that Plaintiff insists it is.

Plaintiff also argues that the April 9, 2002 letter from Defendant is proof of her disability.  Defendant contended during the proceedings before Judge Levin that the letter was negotiated by Plaintiff's attorney in exchange for settling any employment-related claims that Plaintiff might have asserted against the IHA, and therefore should not be accepted as evidence of Plaintiff's disability.  Amended Order 5, n. 5.  The pertinent portion of the letter states: "At the end of her employment, it appeared that [Plaintiff's] performance was adversely affected by her medical

condition." JPF 0165-66. This would be classic hearsay, offered to prove the truth of the matter asserted (that Plaintiff's performance was adversely affected by her medical condition), were it not a party admission. Regardless, the statement is of little evidentiary value; it is so vague (to what extent was it affected?) and so conditional (to whom did it appear that Plaintiff's performance was affected?) as to be nearly meaningless.

Regardless, the evidence establishes that Plaintiff suffered at least to some degree from psoriatic arthritis and depression at the time of her termination. The voluminous medical records between 1997 and 2005 document Plaintiff's ongoing ailments and describe her depression, joint problems, fatigue, swelling, and pain. During and immediately after her employment at the IHA, Plaintiff was on numerous medications for her medical problems. However, Defendant claims there is insufficient evidence in the medical record that Plaintiff was *totally disabled* as of the date that she claims she was totally disabled. Indeed, the medical record is thin between the end 2001 and the beginning of 2002. The medical record that does exist for that period of time does not indicate that Plaintiff could not perform her job duties. For example, on October 9, 2001, Plaintiff's rheumatologist noted that Plaintiff's psoriasis was "[n]ot limiting her from working." JPF 0112. On December 5, 2001, Plaintiff's psychiatrist rated her attention, concentration, reasoning, memory and judgment as "good" or "good/pass" and determined that she had a relatively moderate global functioning assessment. JPF 0217. The same psychiatrist noted on January 2, 2002, that Plaintiff was feeling "fifty percent" better.[18] JPF 0215. On the other hand, the frequent changes in Plaintiff's medication prescriptions are circumstantial evidence that her condition was not improving.

---

[18] Unfortunately, the majority of the records from Dr. Karimi are illegible, so more detailed observations of Plaintiff's mental health are not available.

Documents from Plaintiff's doctors produced *after* the termination date provide a more dire picture of Plaintiff's suffering. For example, Dr. Betman's April 26, 2002 statement indicated that Plaintiff's psoriatic arthritis had degenerated to the point where she was unable to use her fingers for word processing, opening filing cabinet and pulling out files, traveling with and setting up equipment. Dr. Betman noted in the same statement that Plaintiff was limited to sitting for three to four hours per day, standing for two hours, and walking for no more than half an hour. JPF 0296-97. Notes from an office visit to Plaintiff's rheumatologist on April 30, 2002 indicate that Plaintiff's arthritis was "not well controlled" on the course of medications prescribed and that there was "significant [joint] pain and functional limitation in the [left] hand." JPF 105. The rheumatologist Dr. Ramsey-Goldman indicated in her letter to Dr. Betman on May 31, 2002 that Plaintiff's disease had progressed significantly since 1998 and that Plaintiff had suffered from a loss of function in the small joints of her hands and in the wrists, and that there was joint damage in the small joints of both hands. JPF 0222. Significantly, Dr. Ramsey-Goldman stated that she "would support [Plaintiff's] claim of disability when she was unable to work in November, which was shortly after her visit with us in October, and that the official disability date starts in January. This is all consistent with our evaluation and her incomplete response to treatment and the documentation of loss of function and joint damage." *Id.*

Judge Levin found Dr. Ramsey-Goldman's statement insufficient proof of disability because it made a conclusion that Plaintiff was disabled without considering how her functional limitations prevented her from engaging in specific tasks at work. Amended Order 26. Thus, whether Plaintiff meets her burden of showing total disability depends on what this Court finds to be the nature of Plaintiff's job duties. As Cheryl Church's statement indicates, Plaintiff's

main duties were primarily analytical[19] and required research, reading, and phone communication with clients. To the extent that Plaintiff's job required her to do work of an administrative nature, Church indicated that Plaintiff had access to both a Dictaphone and a secretary, who could presumably pull files and print documents for Plaintiff. JPF 0818-0820. In contrast, Plaintiff's description of her job to Grzesik indicated that the job required her to frequently use the computer, keyboard, and mouse, and to pull files. JPF 0480. Plaintiff's work on the quarterly newsletter also required her to use the computer for reading and word processing. *Id.* She did not state whether or not she had a secretary, or to what extent such a secretary could help her with her job. Church contended that Plaintiff traveled less than the 35% of the time stated in the RMC job description; Defendant also indicated in its long-term disability claim job analysis that Plaintiff's job could be modified either temporarily or permanently with reduced travel to accommodate Plaintiff's disability. JPF 0273. Plaintiff stated that she went on business-related trips once every two or three weeks, and stayed away for up to three days. JPF 0480. A significant portion, then, if not necessarily 35%, of Plaintiff's work required her to travel and make presentations to clients.

Plaintiff urges this Court to consider the Seventh Circuit's explanation of "total disability" in *McFarland v. Gen. Am. Life Ins. Co.*, 149 F.3d 583 (7th Cir. 1998) in this determination of whether Plaintiff's ailments constituted a "total disability." In *McFarland*, the plaintiff attempted to collect total disability benefits on an insurance policy that defined "total disability" as being "unable to perform the material and substantial duties of [his] regular

---

[19] The Court notes that Church's description of Plaintiff's job duties as "mental and analytical functioning" and "mentally evaluating client inquiries and mental formulating appropriate responses" seems insincere, since it does not exclude the possibility that such mental work is done primarily by computer, as Plaintiff contends. After all, a litigator's work can be described as "mental analysis" and research, but this mental work might nonetheless require that litigator to sit at a computer eight hours per day formulating those analyses.

occupation." *Id.* at 584. The plaintiff, after suffering from a hernia, was only able to perform

35% of his job duties. *Id.* at 585. The Seventh Circuit held that "a person purchasing disability

insurance with the definition of totally disabled at issue here would reasonably expect that, if he

was no longer able to perform an essential duty of his regular occupation, resulting in the loss of

his position, he would be 'totally disabled.'" *Id.* at 588. Reasoning that "[t]he purpose of the

policy is to protect the individual whose economic expectations and commitments are disrupted

by a change in occupational status due to injury or sickness," the Court offered a baseball

analogy: "[if a] shortstop was no longer able to perform one core and essential aspect of his job

(throwing) as a result of an injury[,] . . . [t]his disability, while affecting only one of several core

skills, would be enough to prevent him from continuing to perform as a shortstop." *Id.*

*McFarland* can be distinguished from this case because "total disability" is defined differently in

the contract at issue,[20] and a district court reviewing a claim for disability benefits pursuant to

ERISA must interpret the insurance policy under the federal rules of contract interpretation.

*O'Reilly*, 272 F.3d at 959. Even without resort to the reasoning in *McFarland*, however, this

Court finds that Plaintiff has met her burden of showing that her functional limitations prevented

her from performing "each of the main duties of her job." It would be a mistake to read the

group policy to preclude total disability benefits for claimants who cannot match a doctor-

confirmed functional limitation to every single task required for her job, considered in isolation.

For example, even if Plaintiff's hands can *literally* grasp a telephone, but doing so would exhaust

her or cause her pain, then she cannot be said to be able to *functionally* perform that task. It is

clear from the Court's review of the medical records that the cumulative effect of Plaintiff's

psoriatic arthritis, fibromyalgia, and depression (and the fatigue and nausea caused by the

---

[20] The group policy requires Plaintiff to prove that she could not perform "each of the main duties" of her occupation.

medications Plaintiff took for her multiple ailments) prevented her from functionally performing "each of the main duties of her job."

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff has established that she is entitled to long-term disability insurance benefits under a group policy issued to her employer, the IHA.  Judgment is entered in favor of Plaintiff.


Enter:

/s/ David H. Coar
David H. Coar
United States District Judge

**Dated:** March 31, 2009